STATE OF NORTH CAROLINA v. RICHARD CRANDELL

No. 288A87

(Filed 30 June 1988)

1. **Constitutional Law § 50— Sixth Amendment right to speedy trial—trial eleven months after arrest—no constitutional violation**

There was no violation of defendant's Sixth Amendment right to a speedy trial in a first degree murder prosecution because defendant's trial was eleven months after his original arrest where much of the evidence and much of the laboratory analysis was being handled through Georgia law enforcement agencies; defendant filed numerous motions at various times; the record does not reflect that defendant at any time sought to have the case brought to a speedy trial; defendant failed to demonstrate that his ability to present his defense was impaired; and there was no indication of neglect or willfulness on the part of the prosecution.

2. **Criminal Law § 91.14— Speedy Trial Act—134 days from indictment to motion to dismiss—no violation**

There was no violation of the Speedy Trial Act in a first degree murder prosecution where 134 days elapsed from defendant's indictment to his motion to dismiss because all but 70 days were excluded by continuances granted by the court based upon a determination that each continuance would serve the ends of justice. A particular order which granted "the continuance" referred to a particular continuance which the State had requested and was not open-ended. N.C.G.S. § 15A-701(b)(7).

3. **Constitutional Law § 31— first degree murder—denial of private investigator —no abuse of discretion**

There was no abuse of discretion in a first degree murder prosecution from the denial of defendant's motion for a court-appointed private investigator where defendant broadly stated that the case was complicated and involved a large number of witnesses, but failed to point to any evidence that might have been obtained by a private investigator and been beneficial to its defense. N.C.G.S. § 7A-450(b).

4. **Constitutional Law § 30— first degree murder—discovery denied—no error**

There was no error in a first degree murder prosecution from the denial of defendant's pretrial motions for discovery where there was no indication that there was any favorable evidence to be disclosed as to defendant's use of public transportation; the State fully complied with statutory requirements for disclosing agreements between prosecutors and any potential witnesses, and there is no mention in N.C.G.S. § 15A-1054(c) of law enforcement agencies; and defendant was not prejudiced by the denial of his motion to require the State to divulge any prior association of a witness with law enforcement agencies where defendant was already aware that the witness had operated in the past as a police informant and there is no statutory or other authority for the proposition that the information sought here is of a type properly subject to mandatory disclosure.

**5. Criminal Law § 91.2— first degree murder—motion for continuance—pretrial publicity from another murder—denied**

The trial court did not err in a first degree murder prosecution by denying defendant's motion for a continuance based upon local publicity arising from the arrest of a suspect in a different murder case three and a half weeks prior to defendant's trial where defendant did not exhaust his peremptory challenges and failed entirely to make any showing that the denial of his motion for continuance made it impossible to obtain a fair trial before an impartial jury.

**6. Jury § 6— first degree murder—individual voir dire and sequestration of jurors denied—no abuse of discretion**

The trial court did not abuse its discretion in a first degree murder prosecution by denying an individual voir dire and sequestration of individual jurors. N.C.G.S. § 15A-1214(j).

**7. Jury § 7.14— murder—peremptory challenges—not racially motivated**

A first degree murder defendant failed to carry his initial burden of establishing an inference of purposeful discrimination in a prosecutor's use of peremptory challenges where the case involved the killing of a black woman by a black man; five black persons were called as potential jurors; two of the potential jurors were peremptorily challenged by the State; one was dismissed by the trial court because he had sat in the courtroom on the previous day during hearings on motions; and the other two blacks were seated on the jury. Art. I, § 26, N. C. Constitution.

**8. Criminal Law § 42.1— first degree murder—admission of insulation particles—no error**

The trial court did not err in a first degree murder prosecution by admitting into evidence certain insulation particles where the State's theory of the case was that defendant crawled through an attic linking his girlfriend's duplex unit with that of the victim; pieces of insulation were found in the victim's apartment; and material taken from defendant's clothing was consistent with the sample pieces of insulation taken from the attic. The evidence was relevant, defendant was under lawful arrest when clothes containing the fibers were taken from him, and defendant had shown no way in which the admission of the evidence in question unfairly prejudiced his case. N.C.G.S. § 8C-1, Rule 403.

**9. Criminal Law § 43.4— first degree murder—photographs admissible**

The trial court did not err in a first degree murder prosecution by admitting certain photographs where three of the five photos showed the victim's body as found in the trunk of a car in an Atlanta parking lot, each was admitted to illustrate specific testimony of the parking lot attendant, and the victim's body appeared in each to be fully clothed and apparently bore no obvious signs of trauma or serious injury. The photos were not excessive in number and were not excessively gruesome or inflammatory. .

State v. Crandell

10. **Criminal Law § 42.1 — murder — evidence as to insulation particles — no unfair surprise**

Defendant was not unfairly surprised or prejudiced in a first degree murder prosecution by the testimony of an SBI agent that insulation was found throughout the victim's apartment and that the covering to the attic access was not pulled down tight; moreover, even assuming error, defendant did not show a reasonable possibility that a different result would have been reached absent the error. N.C.G.S. § 15A-1443(a).

11. **Criminal Law § 88 — murder — irrelevant items — cross-examination not erroneously limited**

The trial court in a first degree murder prosecution did not erroneously limit defendant's right of cross-examination by granting the State's motion to prevent discussion of certain items which were not relevant to this case. N.C.G.S. § 8C-1, Rule 402.

12. **Criminal Law § 89.10 — criminal activities and charges — limiting impeachment of witnesses — harmless error**

Assuming arguendo that the trial court erroneously limited defendant's right to impeach two State's witnesses by cross-examining them concerning criminal activities or pending charges, the error was harmless beyond a reasonable doubt in light of the overwhelming evidence against defendant. N.C.G.S. § 15A-1443(b).

APPEAL as of right by the defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing life imprisonment for first degree murder entered by *Brown, J.*, at the 12 January 1987 Criminal Session of Superior Court, NASH County. Heard in the Supreme Court 9 May 1988.

*Lacy H. Thornburg, Attorney General, by Dennis P. Myers, Assistant Attorney General,* for the State.

*Raymond M. Sykes, Jr.,* for the defendant appellant.

MITCHELL, Justice.

The defendant, Richard Crandell, was convicted of the first degree murder of Lenora Moore. Because there was no evidence of aggravating factors, the trial court sentenced the defendant to life imprisonment. In his appeal to this Court, the defendant brings forward numerous assignments of error concerning the guilt-innocence phase of his trial. Having considered the entire record and each of the defendant's assignments of error, we detect no error in the defendant's trial.

The State's evidence at trial tended to show, *inter alia*, that the defendant frequently lived with his girlfriend, Faye Hinton, in a duplex apartment on Belvedere Street in Rocky Mount, North Carolina. The deceased, Lenora Moore, lived in the other half of the apartment building.

In late December 1985 and early January 1986, the defendant and two friends, Timothy Battle and Kenneth Battle, twice broke into Moore's apartment and stole various items. The defendant gained entry on each occasion by going into the attic of Faye Hinton's apartment, through the crawl space above the apartments, and down into Moore's apartment. These crimes were investigated by the Rocky Mount Police Department, and the defendant and Kenneth Battle confessed to the break-ins. They returned some of the items stolen, and Kenneth Battle's parents paid Moore $800 for those items that could not be recovered. There was conflicting evidence regarding Moore's desire that the defendant be prosecuted.

On the afternoon of Saturday, 18 January 1986, Faye Hinton saw the victim, Lenora Moore, entering her apartment. At that time Moore told Hinton that she had been shopping and showed her a lamp and a blanket that she had purchased. Later that evening, Moore visited her cousin, Randy Smith, and left after telling him that she was going home to watch television. She left Smith's residence alone, driving her red 1985 Nissan Sentra. That was the last time anyone reported seeing Moore alive.

On Tuesday, 21 January 1986, a parking lot attendant discovered a red Nissan Sentra in a parking deck in Atlanta, Georgia. When the car was still there on Wednesday, the attendant informed his supervisor and was told to open the car. When he did, he discovered Moore's body in the trunk of the car.

The pathologist who performed the autopsy testified that Moore's death was caused by a combination of strangling and choking. He estimated that at the time he performed the autopsy on Thursday, 23 January 1986, she had been dead for approximately four days. The doctor also testified, however, that due to the cool weather, the death could possibly have occurred as much as two days earlier or later than his estimate.

The defendant was arrested on 23 January 1986 and charged with breaking and entering in connection with the 27 December 1985 break-in of the deceased's apartment. At the time of his arrest, the defendant's clothes were taken from him. There was material in the defendant's clothes that was "consistent with" known insulation samples from the deceased's attic. Additionally, pieces of this attic insulation were found in the deceased's bathroom, bedroom, kitchen, and living room. With the exception of the insulation, the house appeared very neat and clean with no appearance of any disturbance having occurred there.

John Graham, a friend of the defendant, testified that the defendant had come by his house between 10:00 and 11:00 p.m. on Saturday, 18 January 1986. At that time, the defendant had told Graham that he needed to come up with $800 to pay for items stolen from the victim. On Tuesday, 21 January 1986, the defendant asked Graham to tell the police that it was between 2:30 and 3:30 a.m. on Sunday, 19 January 1986, that they had visited rather than the actual time. The defendant also told Graham that he had killed the victim.

Graham testified that the defendant told him he had gotten to Faye Hinton's apartment at around 1:30 a.m. Sunday morning. After sleeping for about an hour, he decided to kill Moore and went through the attic to gain access to her apartment. He watched her from a closet as she was hanging some curtains. He then choked her and placed something in her mouth to keep her from screaming. He also had sex with her. He then changed her clothes and cleaned up the apartment. He also found $700 in the apartment. He put the deceased's body in the trunk of her car and drove to Georgia. On the way he threw her pocketbook and the sweatsuit that he had been wearing at the time he killed her out of the car. He left her body in the car at a high-rise parking lot in Atlanta, took an airplane to Raleigh, and then rode a bus from Raleigh to Rocky Mount. He got back to Rocky Mount between 6:30 and 7:00 p.m. on Sunday, 19 January 1986. Witness Graham admitted that he had lied to the police several times before finally telling them the truth, which he said was what he had testified to in court. Two of the defendant's cell mates also testified that the defendant had confessed to them that he had killed Moore.

The victim's pocketbook was found beside Interstate Highway 20 in South Carolina. It contained no money. Her credit card was discovered to have been retained by an automatic teller machine at a bank in Rocky Mount. Someone had attempted to use it to withdraw money at 7:47 p.m. on Sunday, 19 January 1986.

The defendant testified that he had played cards with friends until 2:00 a.m. on Sunday, 19 January 1986. He then walked to the home of John Graham and spent the night there, getting up at 12:30 Sunday afternoon. He remained there until he went to Faye Hinton's apartment around 7:00 p.m. According to the defendant, John Graham was in the house when he first got there but not thereafter. On cross-examination the defendant stated that he had sex with the victim on the afternoon of Saturday, 18 January 1986, but that he had never mentioned this to the police. He did tell the police that he had "gone into" her pocketbook and might have touched her credit card. The defendant also introduced evidence to the effect that certain of the State's witnesses had bad reputations for truthfulness and that fingerprints found in the victim's automobile and on her wallet were not his.

I.

In his first assignment of error, the defendant contends that his conviction should be reversed because of violations of his right to a speedy trial under both the Sixth Amendment and the North Carolina Speedy Trial Act. Initially, we address the Sixth Amendment argument.

[1] The Sixth Amendment to the Constitution of the United States guarantees every individual the right to a speedy trial. In *Barker v. Wingo*, 407 U.S. 514, 33 L.Ed. 2d 101 (1972), the Supreme Court set forth the important factors all courts must follow in determining whether a defendant's Sixth Amendment right to a speedy trial has been violated. These factors are identified as "length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530, 33 L.Ed. 2d at 117. This Court has adopted these principles in analyzing and balancing alleged violations of the constitutional right to a speedy trial. *See State v. McKoy*, 294 N.C. 134, 240 S.E. 2d 383 (1978); *State v. Wright*, 290 N.C. 45, 224 S.E. 2d 624 (1976), *cert. denied*, 429 U.S. 1049, 50 L.Ed. 2d 765 (1977). No single factor is determinative. Rather, "the circumstances of each par-

ticular case must determine whether a speedy trial has been afforded or denied, and the burden is on an accused who asserts denial of a speedy trial to show that the delay was due to the neglect or wilfulness of the prosecution." *State v. McKoy*, 294 N.C. 134, 141, 240 S.E. 2d 383, 388. With these principles in mind, we now weigh the four balancing factors in light of the evidence in this case.

First, the defendant's trial was held eleven months after the date of his original arrest. Some delay, however, is permissible in any case.

> The possibility of unavoidable delay is inherent in every criminal action. The constitutional guarantee does not outlaw good-faith delays which are reasonably necessary for the State to prepare and present its case. . . . The proscription is against purposeful or oppressive delays and those which the prosecution could have avoided by reasonable effort.

*State v. Johnson*, 275 N.C. 264, 273, 167 S.E. 2d 274, 280 (1969). Because we do not determine whether the constitutional right to a speedy trial has been violated by the calendar alone, we must consider the length of the delay in relation to the three remaining factors.

Turning to the reason for the delay, we find no indication of neglect or willfulness on the part of the prosecution. This murder case was complicated by the fact that much of the evidence and much of the laboratory analysis was being handled through Georgia law enforcement agencies. The record shows that the defendant filed ten separate motions at various times prior to the filing of the State's first motion to continue on 30 June 1986. In that motion, the State related that results of tests by the Georgia Bureau of Investigation were pending. Thereafter, there were numerous other motions filed by the defendant, and two motions by the State to continue. In one dated 4 September 1986, the State indicated that there had been inadequate time to prepare the case for trial and that results of some laboratory tests had not been received by the prosecutor. On 22 October 1986, the State again moved to continue the case, stating that a hearing on various pretrial motions of the defendant was necessary before the case could be tried. All of these matters tend to indicate that there was no willful delay on the part of the State.

Next, we examine the defendant's demand for a speedy trial. The record does not reflect that the defendant at any time sought to have the case brought to trial. The first motion in this regard was a motion *to dismiss* dated 2 September 1986. The defendant has not shown that he attempted to have the case brought to a speedy trial.

Finally, we look to the issue of prejudice. The defendant argues that the delay in his trial made it impossible for him to reconstruct the events of the Saturday evening or Sunday morning in question through the testimony of any witnesses. We disagree. According to the defendant's own testimony, the only person he saw between 2:00 a.m. and 7:00 p.m. on the crucial Sunday was John Graham. John Graham directly contradicted this alibi testimony when he testified that the defendant had in fact come by his house around 10:00 or 11:00 p.m. on Saturday and had subsequently asked Graham to lie to the police by saying that the defendant had stayed through Sunday. Thus, the defendant has failed to demonstrate that his ability to present his defense was impaired by delay in the trial.

The proceedings from the time of the defendant's arrest until the conclusion of his trial, analyzed in light of the constitutionally mandated factors, reveal no violation of the defendant's constitutional right to a speedy trial. Having addressed the defendant's Sixth Amendment concerns, we now turn to an analysis under the Speedy Trial Act.

[2] The North Carolina Speedy Trial Act provides that the trial of a defendant charged with a criminal offense shall begin within 120 days from the date the defendant is arrested, served with criminal process, waives an indictment, or is indicted, whichever occurs last. N.C.G.S. § 15A-701(a)(1) (1983). The Act further provides:

> (b) The following periods shall be excluded in computing the time within which the trial of a criminal case must begin:
>
> . . . .
>
> (7) *Any* period of delay resulting from a continuance granted by any judge if the judge granting the continuance finds that the ends of justice served by granting the continuance outweigh the best interests of the public and the de-

fendant in a speedy trial and sets forth in writing in the record of the case the reasons for so finding. . . .

. . . .

> When a judge grants a continuance pursuant to this subsection, he *may* specify in his order the period of time which shall be excluded from the time within which the trial of the criminal case must begin.

N.C.G.S. § 15A-701(b)(7) (emphasis added).

At the 2 September 1986 term of Superior Court, Nash County, the defendant moved the court to dismiss the charges against him for failure of the State to comply with the Speedy Trial Act. At that time 134 days had passed since the defendant had been indicted on 21 April 1986. Nevertheless, we find no violation of the Speedy Trial Act.

The statute explicitly provides that a period of delay resulting from a continuance granted by a judge, after considering the factors set forth in N.C.G.S. § 15A-701(b)(7), shall be excluded in computing the 120 day period. The additional provision allowing a judge to specify the time to be excluded is purely permissive, there being no requirement for the judge to do so. In this case there were four continuances granted. The wording of each order was the same:

> Considering the factors set forth in G.S. 15A-701(b)(7), the Court finds that the ends of justice served by granting the continuance outweigh the best interests of the public and defendant in a speedy trial and therefore grants the continuance for the reasons above. The Court orders that the following time be excluded in determining whether a trial has been held within the time limits established by G.S. 15A-701.

The defendant was indicted on 21 April 1986. Seventy days later, on 30 June 1986, Judge Tillery entered an order continuing the trial from 30 June to 1 September 1986. On 2 September 1986, Judge Strickland entered an order continuing the trial until 19 October 1986. On 22 October 1986, Judge Lewis entered an order continuing the trial from 20 October through 15 December. Finally, on 12 December 1986, Judge Allsbrook entered an order continuing the trial from 15 December until 12 January 1987. The

case came to trial on 12 January 1987. As previously noted each order granting a continuance was based upon a determination that it would serve the ends of justice. Therefore, the *only period* of time from the defendant's indictment until the date of the trial that was *not excluded* from the 120 day computation was the *seventy days* between 21 April and 30 June 1986. The defendant's trial was held well within the time allowed by the statute.

The defendant cites *State v. Smith*, 87 N.C. App. 474, 361 S.E. 2d 422 (1987), for the proposition that, because Judge Tillery did not specify in a separate space in his order the period to be excluded, there was no time excluded from the 120 day computation. We find that case to be distinguishable. In *Smith* the motion requested that the trial be continued from 5 May 1986, but did not provide any time for the continuance to end and trial of the case to begin. The court's order followed the same open-ended format. Thus, there was no ending date to the continuance and no way to determine what period, if any, should be excluded from the 120 days. The Court of Appeals stated that in determining what time is excludable as having resulted from a continuance, "the trial court should be able to determine the excluded period from the face of the order or with reference to easily obtainable, undisputed facts." *Id.* at 477, 361 S.E. 2d at 425.

In the instant case the motion in question requested a continuance from 30 June 1986 through 1 September 1986. Judge Tillery's order stated that he "grants *the continuance* for the reasons above." (Emphasis added.) By the words "the continuance," Judge Tillery could only have been referring to the continuance from 30 June 1986 to 1 September 1986 that the State had requested. Therefore, this was not an open-ended continuance as was the case in *Smith*.

The defendant has failed to demonstrate that he was denied his right to a speedy trial under either the Sixth Amendment or the North Carolina Speedy Trial Act. This assignment of error is without merit and is overruled.

## II.

In his second assignment of error, the defendant complains that he was deprived of his rights to due process and equal protection because he was denied access to evidence favorable to his

defense and likely to affect the outcome of his trial. First, the defendant contends under this assignment that the trial court erred in denying his motion for a court appointed private investigator.

[3] N.C.G.S. § 7A-450(b) requires the State to provide indigents with counsel and the other necessary expenses of representation. The statute, however, requires the appointment of expert assistance only upon a showing by the defendant that: (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it will materially assist him in the preparation of his defense. *State v. Johnson*, 317 N.C. 193, 344 S.E. 2d 775 (1986).

The defendant cites *Ake v. Oklahoma*, 470 U.S. 68, 84 L.Ed. 2d 53 (1985), for the proposition that a defendant is entitled to the appointment and the assistance of experts if he makes a threshold showing of specific necessity of the expert requested. Although the defendant broadly stated that the case was complicated and involved a large number of witnesses, he failed to point to any evidence that might have been obtained by a private investigator and been beneficial to his defense. "Mere hope or suspicion that such evidence is available will not suffice." *State v. Tatum*, 291 N.C. 73, 82, 229 S.E. 2d 562, 568 (1976). The defendant in this case offered only "undeveloped assertions that the requested assistance would be beneficial." *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1, 86 L.Ed. 2d 231, 236 n.1 (1985). That alone was not enough to require the appointment of additional assistance. *See State v. Penley*, 318 N.C. 30, 347 S.E. 2d 783 (1986).

Moreover, the question of whether an expert should be appointed at State expense to assist an indigent defendant lies within the sound discretion of the trial court. *State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562. Here, the defendant has shown neither an abuse of that discretion, nor that he was deprived of a fair trial.

[4] In his second argument under this assignment, the defendant complains that he was prejudiced by the denial of, or the State's incomplete response to, three pretrial motions dealing with the discovery of various evidentiary matters. The defendant's motions included a motion to compel discovery of favorable evidence, a motion to expose witness agreements, and a motion to disclose

any prior association between a State's witness and local law enforcement agencies. We address each of these motions in turn.

The defendant first sought the results of the State's investigation into his use of public transportation services from Atlanta to Raleigh and from Raleigh to Rocky Mount. N.C.G.S. § 15A-904 specifically states that, except for statements of a defendant or codefendant, a defendant's prior record, or reports of examinations and tests, our statutes providing for discovery in criminal cases do not require the production of any reports, memoranda, or other internal documents made by law enforcement officers or other persons acting on behalf of the State in connection with the investigation of the case. Moreover, we have held that the trial court has no authority to order discovery contrary to N.C.G.S. § 15A-904. *State v. Hardy,* 293 N.C. 105, 235 S.E. 2d 828 (1977).

The defendant relies upon *Brady v. Maryland,* 373 U.S. 83, 10 L.Ed. 2d 215 (1963), for the proposition that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or the bad faith of the prosecution." *Id.* at 87, 10 L.Ed. 2d at 218. *Brady* involved a situation in which the prosecution deliberately withheld evidence favorable to the accused. That case is easily distinguishable from the facts here. In this case there is no indication that there was any favorable evidence to be disclosed. The failure of the State to offer any evidence that the defendant used the public transportation system to return from Atlanta to Rocky Mount at or about the time the victim's body was found in Atlanta may have been a proper matter for jury argument. Evidence of the State's failure to develop such proof, however, was not subject to discovery.

Next, the defendant contends that he was prejudiced by the trial court's failure to compel the State to disclose any agreements between the prosecutor *or any law enforcement agency* and any potential witness. In the State's response the prosecutor only indicated that no agreements or promises had been made to any witness by the "District Attorney's Office," with no mention of law enforcement agencies. We find the defendant's argument unpersuasive. The pertinent statute provides: "When a *prosecutor* enters into any arrangement authorized by this section, written notice fully disclosing the terms of the arrangement must be

provided to defense counsel . . . ." N.C.G.S. § 15A-1054(c) (1983) (emphasis added). There is no mention in the statute of law enforcement agencies. The State fully complied with the statutory requirements for exposing such agreements, and this contention is without merit.

Finally, the defendant argues under this assignment that he was prejudiced by the denial of his motion to require the State to divulge any prior association of the witness Grady Tart with law enforcement agencies. The State called Tart to testify to the defendant's "quasi" admission in jail that he had killed the deceased and that he had a motive to kill her.

The defendant, through his counsel, was aware that Tart had operated as an informant for the Rocky Mount Police Department in the past. The defendant maintains that further evidence of such prior associations between Tart and officers was material and important to his case in two ways. First, it would have given the defendant valuable information with which to impeach the witness. Second, the failure of the trial court to compel disclosure of this information may have precluded the defendant from attacking the admission of the statement.

We find the defendant's argument meritless. There is no statutory or other authority for the proposition that the information sought here is of a type properly subject to mandatory disclosure. Furthermore, the defendant already had information that Tart had served as a police informant in the past. He was certainly free to use this information for impeachment purposes or to attack the admissibility of the witness's statements. This assignment is overruled.

### III.

In his next assignment of error, the defendant contends that the trial court committed prejudicial error by denying his motions to continue, to allow individual voir dire and sequestration of jurors, and to prohibit the State's use of racially motivated peremptory challenges. We consider these assignments *seriatim.*

[5] The defendant moved at trial for a continuance based on local publicity arising from the arrest of a suspect in a murder case that occurred three and one-half weeks prior to the defendant's trial. The defendant presents an interesting question in this

regard: whether the prejudicial pretrial publicity surrounding a different and unrelated case is sufficient to deny the defendant his Sixth Amendment right to an impartial jury. All of our cases on the issue of prejudicial pretrial publicity have been decided in the context of publicity surrounding the particular defendant's case itself and the denial of the defendant's motion to change venue or for a special jury venire. *See, e.g., State v. Baker,* 312 N.C. 34, 320 S.E. 2d 670 (1984); *State v. Watson,* 310 N.C. 384, 312 S.E. 2d 448 (1984); *State v. Jerrett,* 309 N.C. 239, 307 S.E. 2d 339 (1983). The defendant urges that the present case is distinguishable from such cases, because it did not involve a request for a change of venue or a special venire. This defendant simply asked the court for a postponement of his trial: relief that he contends is substantially less extraordinary.

We find it unnecessary, however, to decide whether a defendant's right to an impartial jury will ever be denied by publicity about an unrelated case. Addressing a defendant's motion to continue in *State v. Thomas,* 294 N.C. 105, 240 S.E. 2d 426 (1978), we stated:

> A motion for continuance is ordinarily addressed to the sound discretion of the trial court and its ruling is not subject to review absent an abuse of discretion. However, if the motion is based on a right guaranteed by the Federal and State constitutions, the question presented is one of law and not of discretion, and the ruling of the trial court is reviewable on appeal. Whether a defendant bases his appeal upon an abuse of discretion or a denial of his constitutional rights, he must show both that there was error in the denial of the motion and that he was prejudiced thereby before he will be granted a new trial.

*Id.* at 111, 240 S.E. 2d at 431. The defendant has failed entirely to make any showing tending to support his contention that the denial of his motion for a continuance made it impossible for him to obtain a fair trial before an impartial jury. To the contrary, the defendant did not even exhaust his peremptory challenges. The defendant has failed to show either error or that he was prejudiced.

[6] In addition, the defendant argues that he was rendered incapable of presenting a detailed showing of prejudice because of the

trial court's error in denying his motion for an individual voir dire and the sequestration of the potential jurors. N.C.G.S. § 15A-1214(j) states that a judge may "for good cause shown" allow the individual voir dire of jurors. The defendant contends that due to the short time span between the "inflammatory" publicity and the beginning of the trial, it was absolutely necessary for him to be allowed to document, through individual questioning, the personal biases of prospective jurors. Without the opportunity for individual voir dire of the jurors, the defendant argues that he could not show that he had suffered prejudice sufficient to warrant a new trial.

We note that motions for individual voir dire and for sequestration of jurors, like motions to continue, are addressed to the sound discretion of the trial court, and its rulings will be disturbed only for an abuse of discretion. *State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183 (1980). Again, the defendant has failed to make any showing of an abuse of discretion on the part of the trial court in the instant case.

[7] Finally, the defendant contends under this assignment that the trial court erred in refusing to prohibit the State's use of racially motivated peremptory challenges. Article 1, section 26 of the Constitution of North Carolina prohibits any action by the State to deny jury service to any individual based on race. Such practices were also prohibited by the landmark decision in *Batson v. Kentucky*, 476 U.S. 79, 90 L.Ed. 2d 69 (1986). There, the Supreme Court of the United States admonished that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89, 90 L.Ed. 2d at 83.

In *Batson* the Supreme Court established a three-part test for determining whether a defendant has established a prima facie case of purposeful discrimination:

> To establish such a case, the defendant first must show that he is a member of a cognizable racial group . . ., and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there

can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." . . . Finally, the defendant must show that these facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude veniremen from the petit jury on account of their race.

*Id.* at 96, 90 L.Ed. 2d at 87-88. The initial burden is on a criminal defendant who alleges such racial discrimination in the selection of the jury to establish an inference of purposeful discrimination. *State v. Mitchell*, 321 N.C. 650, 365 S.E. 2d 554 (1988). The defendant here has failed to carry that burden.

This case involved the killing of a black woman by a black man. Five black persons were called as potential jurors. Two of them were peremptorily challenged by the State. One was dismissed by the trial court because he had sat in the courtroom on the previous day during hearings on motions in this case. The other two blacks were seated on the jury. The defendant has failed to show that these facts and any other relevant circumstances raise an inference that the State, in exercising its peremptory challenges, was acting out of any racial bias or any desire to exclude black persons from the jury on the basis of race.

In *State v. Belton*, 318 N.C. 141, 347 S.E. 2d 755 (1986), twelve black jurors were tendered to the State. It peremptorily challenged six of them and thus accepted fifty percent of the blacks tendered. In *State v. Abbott*, 320 N.C. 475, 358 S.E. 2d 365 (1987), five blacks were tendered as prospective jurors to the State, and it exercised peremptory challenges to three of them. As in both *Belton* and *Abbott*, we conclude here that the defendant failed to make a prima facie showing that the prosecutor used peremptory challenges to exclude jurors because of their race. He has not met the test set out in *Batson*, and this assignment of error is overruled.

## IV.

In his final assignment of error, the defendant argues that the trial court erred by allowing prejudicial evidence to be submitted to the jury and by denying his Sixth Amendment right to

confrontation. Here, the defendant challenges several evidentiary rulings of the trial court. We consider each separately.

[8]   First, the defendant challenges the admission of certain insulation particles into evidence. The State's theory of this case was that the defendant crawled through the attic linking the duplex unit of the victim Moore with that of the defendant's girlfriend. William Rose of the State Bureau of Investigation testified that pieces of insulation were found in the victim's apartment. He further testified that material taken from the defendant's clothing, which he was wearing at the time of his arrest on 29 January, was "consistent with" the sample pieces of insulation taken from the attic. Although the fact that insulation particles in the defendant's clothing had apparently come from the attic used to gain access to the victim's apartment does not prove that he killed her, it was relevant to the State's case. Evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue in the case. *State v. Wingard*, 317 N.C. 590, 346 S.E. 2d 638 (1986); *State v. Sloan*, 316 N.C. 714, 343 S.E. 2d 527 (1986); N.C.G.S. § 8C-1, Rule 401 (1986). Certainly a fact of consequence in this action was the presence of fiber on the defendant's clothing consistent with that found in the victim's apartment.

The defendant also contends that the insulation fibers were unlawfully obtained from him. The defendant concedes, however, that he was under lawful arrest at the time his clothes containing the fibers were taken from him. That being the case, the clothing worn by him at the time of the arrest and the relevant evidence it yielded were properly taken. *State v. Dickens*, 278 N.C. 537, 180 S.E. 2d 844 (1971).

Finally, with respect to this evidence, the defendant contends that it should have been excluded pursuant to Rule 403 of the North Carolina Rules of Evidence because of the danger of unfair prejudice. The defendant, however, has shown no way in which the admission of the evidence in question *unfairly* prejudiced his case. Accordingly, we find no error in the admission of the insulation particles.

[9]   In his second argument under this assignment, the defendant complains that certain photographs introduced by the State were prejudicial to his case. It appears from the record that five photographs were admitted into evidence. Three of these photo-

graphs showed the victim's body in the trunk of the vehicle discovered in the parking lot in Atlanta. Each was admitted to illustrate specific testimony of the parking attendant. In each the victim's body appeared to be fully clothed and apparently bore no obvious signs of trauma or serious injury.

The defendant argues that these pictures were inflammatory and cites *State v. Mercer*, 275 N.C. 108, 165 S.E. 2d 328 (1969), for the proposition that photographs of a deceased's body that are inflammatory and without probative value should not be admitted into evidence. In that case four photographs of the dead body of the victim, depicting substantially the same scene, were held to be competent and admissible to illustrate the trial testimony. The pictures that this Court concluded should not have been admitted in *Mercer* were photographs of the deceased in the funeral home with probes projecting from his body indicating the entry, course, and exit of the bullets that caused his death. The photographs that we specifically found were not objectionable in *Mercer* were very similar to those in question here.

The photographs in the present case were not excessive in number, nor were they excessively gruesome or inflammatory. They did illustrate the testimony of the witnesses with respect to the location and position of the deceased's body. Therefore, they were properly admissible.

[10] In his next argument under this assignment, the defendant contends that he was unfairly surprised and prejudiced by the testimony of Agent Rose to the effect that insulation was found throughout the victim's apartment and that the covering to the attic access was not pulled down tight. The defendant has not attempted to show how he was unfairly prejudiced by the testimony regarding the attic door. Moreover, he has failed to show how he was prejudiced by learning at the trial that there was insulation in more places than he had originally been told. Accordingly, even assuming error *arguendo*, the defendant clearly failed to meet his burden of showing a reasonable possibility that, absent the error, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1983).

[11] The defendant also argues that the trial court erroneously limited his right to cross-examination. First, the defendant cites as error the granting of the State's motion to prevent discussion

at trial of a sanitary napkin and some other items found in For-syth County, Georgia, near Interstate Highway 85. The items were unrelated to this case and therefore did not qualify as rele-vant evidence under Rule 401. Because they were not relevant, they were not admissible. N.C.G.S. § 8C-1, Rule 402 (1986).

[12]   Next, the defendant asserts that his ability to cross-exam-ine and confront the State's witness Tommy Odom was improper-ly restricted by the trial court. He cites *Davis v. Alaska*, 415 U.S. 308, 39 L.Ed. 2d 347 (1974), for the proposition that the Sixth Amendment right of confrontation requires that a defendant be allowed to impeach prosecution witnesses by cross-examination di-rected to their possible bias in the case on trial.

The defendant's counsel attempted to impeach the credibility of the witness Odom by delving vigorously into his use of nar-cotics and his ties with the Rocky Mount Police Department. He asked the witness whether his house was known as the local "crack house" and whether he used heroin and cocaine. The trial court sustained objections to all these questions. The defendant's theory seems to have been that this information was relevant as to whether the witness believed that his testimony at trial would garner favor with the police.

It is well established that a trial court's ruling on an eviden-tiary point is presumed to be correct unless the complaining party can demonstrate that the particular ruling was in fact incor-rect. *State v. Milby*, 302 N.C. 137, 273 S.E. 2d 716 (1981). Even if the complaining party can demonstrate that the trial court erred in its ruling, relief will not be granted absent a showing of preju-dice. *Id.* A defendant is prejudiced by a violation of a right arising under the Constitution of the United States unless such violation was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1983). In the present case, even assuming *arguendo* that the trial court erroneously limited the defendant's right to impeach the State's witnesses, we conclude that the error was harmless be-yond a reasonable doubt.

The evidence against the defendant was overwhelming. At the time of his arrest, the defendant's clothes were taken from him. There was material in his clothes that was "consistent with" known insulation samples from the deceased's attic. John Graham, a friend of the defendant, testified that the defendant had come

by his house between 10:00 and 11:00 p.m. on Saturday, 18 January 1986. At that time, the defendant told Graham that he needed to come up with $800 to pay for the items stolen from the victim. On Tuesday, 21 January 1986, the defendant asked Graham to tell the police that it was between 2:30 and 3:30 a.m. on Sunday, 19 January 1986, that they had visited rather than the actual time. The defendant also told Graham and others that he had killed the deceased. In light of all of the evidence against the defendant, we conclude that any error by the trial court in failing to allow the defendant to more fully impeach witness Odom's testimony was harmless beyond a reasonable doubt.

Finally, the defendant argues that the trial court erroneously limited his cross-examination of the witness Grady Tart. The defendant attempted to ask Tart about charges that were pending against him for which he was to have been arraigned on the week of the defendant's trial. The defendant speculates that as a result of the charges pending, the witness testified so as to curry favor with the State. For the reasons previously stated, however, we conclude that any error in the trial court's ruling was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1983).

In conclusion, having carefully reviewed the record and each of the defendant's assignments of error, we hold that the defendant received a fair trial, free of prejudicial error.

No error.