STATE OF NORTH CAROLINA v. SYLVIA IPOCK WHITE

No. 487A93

(Filed 2 June 1995)

### 1. Criminal Law § 286 (NCI4th)— noncapital first-degree murder—continuance—pending capital trial—continuance denied—no error

There was no violation of defendant's constitutional rights where defendant was tried noncapitally on an indictment charging her with the first-degree murder of her stepson in 1973, moved that this trial be continued until after the pending capital trial for the murder of her husband, and that motion was denied. Although defendant contended that she was forced to choose between testifying in her own behalf in this case and waiving her constitutional privilege against self-incrimination in the capital trial or waiving her constitutional right to testify in this trial to preserve her right against self-incrimination in her capital trial, the denial of the motion did not force defendant to choose between two constitutional rights but to make a purely tactical decision as to whether it would be more advantageous to testify in this trial, in the capital trial, in both trials, or not at all. She would have faced the same dilemma regardless of which case was tried first since any incriminating statements made at the first trial could be used against her at the second trial.

**Am Jur 2d, Continuance § 60.**

### 2. Criminal Law § 288 (NCI4th)— motion for continuance — denied—not supported by findings—no error

There was no abuse of discretion in a noncapital first-degree murder prosecution in the denial of defendant's motion for a continuance where the ruling was not supported by any findings or analysis indicating that the trial court seriously considered the motion or the factors listed in N.C.G.S. § 15A-952(g). The judge was not required to make specific findings of facts in denying the motion for a continuance because the facts presented in defendant's motion were not in dispute and the evidence before the court at the time the motion was heard clearly showed that none of the factors in N.C.G.S. § 15A-952(g) was present in this case.

**Am Jur 2d, Continuance § 59.**

STATE v. WHITE

[340 N.C. 264 (1995)]

3. **Indigent Persons § 27 (NCI4th)— noncapital murder— motion for funds for private investigator—no ex parte hearing**

There was no prejudice from the trial court's refusal to hold an *ex parte* hearing on defendant's pretrial motion for funds to hire an investigator in a noncapital first-degree murder prosecution where the court improperly based the denial of an *ex parte* hearing on defendant's failure to make a threshold showing of a particularized need, but defendant was not entitled as a matter of right to an *ex parte* hearing on her motion because the request for an investigator is more analogous to a request for fingerprint expert as in *State v. Phipps*, 331 N.C. 427, than to a request for a psychiatrist as in *State v. Ballard*, 333 N.C. 515.

**Am Jur 2d, Criminal Law §§ 719, 771, 955, 1006.**

**Right of indigent defendant in criminal case to aid of state by appointment of investigator or expert. 34 ALR3d 1256.**

**Right of indigent defendant in state criminal case to assistance of investigators. 81 ALR4th 259.**

4. **Criminal Law § 762 (NCI4th)— noncapital first-degree murder—instruction during jury selection—reasonable doubt—moral certainty**

There was no error in a noncapital first-degree murder prosecution where the court gave a "moral certainty" reasonable doubt instruction during jury selection which defendant contended reduced the State's burden of proof below the standard required by the due process clause. The reasonable doubt instruction given during jury selection, taken as a whole, correctly conveyed the concept of reasonable doubt to the jury; moreover, even if there was error in the preliminary instruction, the trial court's use of the pattern jury instruction in its charge to the jury before it retired for deliberation cured any possible defect in the earlier instruction.

**Am Jur 2d, Evidence §§ 168, 170.**

5. **Jury § 132 (NCI4th)— noncapital first-degree murder— jury selection—questions concerning pretrial publicity**

The trial court did not abuse its discretion during jury selection for a noncapital first-degree murder prosecution where the

court did not allow defendant to ask whether the publicity surrounding the case or fear of later criticism would affect their verdict or their ability to be fair. Whether the case would attract future media attention or might subject jurors to criticism was purely speculative. These questions were an attempt by defense counsel to stake out prospective jurors and were not likely to result in answers relevant to a juror's qualification to serve.

**Am Jur 2d, Criminal Law § 688; Jury §§ 199, 208.**

**6. Criminal Law § 107 (NCI4th)— noncapital first-degree murder—witness—files as drug informant—not disclosed**

There was no error in a noncapital first-degree murder prosecution where the trial court denied defendant's motion for disclosure of all files pertaining to a witness's activities as a drug informant. Defendant was aware that the witness had acted as a police informant in the past and was free to use that information for impeachment purposes.

**Am Jur 2d, Depositions and Discovery § 443.**

**7. Evidence and Witnesses § 364 (NCI4th)— noncapital first-degree murder—other offense—chain of circumstances**

The trial court did not err in a noncapital first-degree murder prosecution by admitting evidence of defendant's alleged involvement in another murder where defendant was charged with the 1973 murder of her four year old stepson following a 1991 conspiracy to kill her husband and her motion *in limine* to exclude the evidence of her alleged involvement in her husband's death from the trial for the murder of her stepson was denied. The trial court's findings of fact and conclusions of law make it clear that the evidence of defendant's confession to the witness was admitted for the purpose of refuting accident and that the interwoven evidence of defendant's participation in her husband's murder was admitted for the purpose of establishing the witness's credibility and the contextual basis for defendant's confession; the evidence was so intertwined that the trial court did not err in concluding that all the evidence was admissible under the chain of circumstances rule. Finally, the trial court did not abuse its discretion under N.C.G.S. § 8C-1, Rule 403 by concluding that the probative value of the interwoven evidence outweighed any prejudicial effect. N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Evidence §§ 326-327.**

**8. Criminal Law § 787 (NCI4th)— noncapital first-degree murder—instruction on lack of accident**

The trial court did not err in the prosecution of defendant for the noncapital first-degree murder of her stepson by instructing the jury that it could consider evidence of defendant's involvement in her husband's murder to prove the absence of accident. The instruction was consistent with the trial court's findings of fact and conclusions of law in connection with the admission of this "other crimes" evidence. Furthermore, the trial court correctly limited the consideration of this evidence to the determination of the witness's credibility and absence of accident.

**Am Jur 2d, Evidence § 340; Homicide § 112.**

**9. Evidence and Witnesses § 650 (NCI4th)— noncapital first-degree murder—motion in limine—no ruling**

There was no error in a noncapital first-degree murder prosecution from the court's failure to rule on a motion *in limine* to prohibit the prosecutor from cross-examining defendant with allegedly inadmissible evidence of her involvement in her husband's murder where the "other crimes" evidence here had been properly ruled admissible pursuant to N.C.G.S. § 8C-1, Rule 404(b) under the "chain of circumstances" rule. A criminal defendant's decision not to testify based on the introduction of competent admissible evidence against her is purely a tactical decision that does not implicate any of her constitutional rights; as there was no threat that impermissible evidence would be used to cross-examine defendant, she was not impermissibly discouraged from testifying at trial.

**Am Jur 2d, Evidence § 865.**

**10. Evidence and Witnesses § 1694 (NCI4th)— noncapital first-degree murder—photograph of victim in casket—admissible**

The trial court did not err in a noncapital first-degree murder prosecution by admitting a photograph of the victim in his casket in a funeral home where no autopsy or criminal investigation was conducted at the time of the victim's death in 1973, no photographs were taken of the victim as he appeared at the time of his death other than this photograph, only the victim's bones remained when the body was exhumed, and this photograph was the only physical evidence to illustrate testimony about the con-

dition of the victim's body shortly after the time of his death. Moreover, the photograph and accompanying testimony were relevant to establish the *corpus delicti* of the crime.

**Am Jur 2d, Evidence §§ 971, 974; Homicide §§ 416-417.**

**11. Evidence and Witnesses § 212 (NCI4th)— noncapital first-degree murder—victim's prior injuries—admissible**

There was no error in a first-degree murder prosecution in the admission of evidence that the four year old victim had suffered from a skull fracture and severe burns on his leg and ankle several weeks before his death where a basis existed for the jury to infer that defendant was responsible for the prior injuries and the evidence that the victim suffered from a severe skull fracture and serious burns shortly before his death was relevant to the jury's determination of whether defendant was criminally negligent. Furthermore, this evidence was relevant and admissible under N.C.G.S. § 8C-1, Rule 404(b) as proof of defendant's preparation and planning for the commission of this crime and that the victim's death was not accidental.

**Am Jur 2d, Evidence §§ 270-271; Homicide § 13.**

**12. Evidence and Witnesses § 84 (NCI4th)— noncapital first-degree murder—victim's life insurance—defendant as beneficiary**

The trial court did not err in the prosecution of defendant for the noncapital first-degree murder of her four year old stepson by admitting evidence that her husband, an insurance agent, amended the victim's life insurance policy six days before his death to designate defendant as a co-beneficiary. Evidence of motive is relevant when it has a tendency to show that the defendant committed the crime at issue. The extent of defendant's knowledge about this insurance policy impacted only on the weight to be accorded the evidence.

**Am Jur 2d, Homicide § 12; Evidence § 435.**

**13. Evidence and Witnesses §§ 2162, 2251, 2262 (NCI4th)— noncapital first-degree murder—child's death as accidental—nurses' testimony**

The trial court did not err in a noncapital first-degree murder prosecution for the death of a four year old child by admitting tes-

timony from three nurses who were in the emergency room when the victim was brought in and who were present when a piece of plastic was removed from the victim's throat that the plastic could not have been accidentally swallowed by the victim. By overruling defendant's objections, the trial court implicitly accepted the nurses as expert witnesses and defendant waived her right to raise that issue on appeal by failing to specifically object to their qualifications at trial. Even if a challenge to their qualifications had been preserved, these nurses were in fact qualified to render their opinions as experts because they were in a better position than the jurors to know if it was physically possible for a piece of plastic the size of the one removed from the victim's throat to be accidentally swallowed or inhaled so deeply that it could not at first be seen. The use of the term "accident" by one nurse was not a legal term of art or an opinion as to the standard the jury should apply.

**Am Jur 2d, Expert and Opinion Evidence § 365.**

14. **Evidence and Witnesses § 2890.5 (NCI4th)— noncapital first-degree murder—child's death—medical examiner—cross-examination as to reputation**

     The trial court did not err in the noncapital first-degree murder prosecution of defendant for the 1973 death of her four year old stepson by excluding evidence on cross-examination about the competency of the medical examiner who removed a piece of plastic from the victim's throat and who signed the 1973 death certificate stating that the death was accidental. The prosecutor did not open the door to the admission of the testimony about the medical examiner's general reputation in the medical community because the prosecutor had merely disputed the conclusion that this death was accidental. Moreover, the doctor's current standing in the medical community has no logical probative value on whether his twenty-year-old opinion about this murder was accurate and supported by an a thorough investigation. Finally, assuming that the doctor's reputation for competency as a doctor had been attacked, that evidence was not probative of character for truthfulness and would not have been admissible.

     **Am Jur 2d, Witnesses §§ 484 et seq.**

STATE v. WHITE

[340 N.C. 264 (1995)]

**15. Criminal Law §§ 380, 396 (NCI4th)— noncapital first-degree murder—remarks by judge—opening remark on State's burden of proof—comment to defense counsel**

There was no reversible error in a noncapital first-degree murder prosecution where the trial court, in its preliminary remarks to prospective jurors, made a remark which defendant contends denigrated her plea of not guilty and suggested that the trial was a mere formality, but which in context accurately instructed the jury about defendant's presumption of innocence and the State's burden to prove every material element of its charges beyond a reasonable doubt; and where the court commented to defense counsel that "You can talk to her now . . ." when defense counsel was cross-examining a witness concerning her refusal to talk with defense counsel prior to trial. In context, the court's comment was intended to end defense counsel's badgering of the witness. The necessity for the court to intercede was created by defense counsel and the court's comment did not increase any prejudice to defendant arising from the conduct of her attorney.

**Am Jur 2d, Trial § 92.**

**16. Criminal Law § 787 (NCI4th)— noncapital first-degree murder—instruction on accident—theory of acquittal—not in mandate—no plain error**

There was no plain error in a noncapital first-degree murder prosecution for the murder of defendant's four year old stepson in 1973 where the court instructed on accident as a theory of acquittal but did not include "not guilty by reason of accident" in the final mandate.

**Am Jur 2d, Trial § 726.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Griffin, J., at the 12 April 1993 Special Criminal Session of Superior Court, Martin County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 12 January 1995.

*Michael F. Easley, Attorney General, by Thomas F. Moffitt, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant-appellant.*

**STATE v. WHITE**

[340 N.C. 264 (1995)]

PARKER, Justice.

Defendant was tried noncapitally on an indictment charging her with the first-degree murder of her stepson, Billy C. White, II ("victim"). The jury returned a verdict finding defendant guilty of first-degree murder, and defendant was sentenced to life imprisonment. For the reasons discussed herein, we conclude that defendant's trial was free of prejudicial error and uphold her conviction and sentence.

The State's evidence tended to show that in June 1973, defendant, Sylvia Ipock White, lived in Kinston, North Carolina, with her husband, Billy White, Sr. The Whites lived in an affluent part of Kinston with three of defendant's children from a previous marriage and four of her husband's children from a previous marriage. The victim was defendant's four-year-old stepson.

On 21 June 1973, the victim was at home with defendant while his brothers and sisters were at school. At approximately 3:00 p.m., defendant rushed the victim to the emergency room at Lenoir Memorial Hospital. The child's skin was extremely white, and he was pronounced dead upon arrival at the hospital. Peggy Chrisco and Susan Manning, two nurses on duty when the victim was brought into the emergency room, were informed that the child had swallowed a piece of plastic. They looked into the child's mouth using a tongue depressor or a laryngoscope but saw no foreign objects. Anita McGirt, the hospital's operating room manager, was passing through the emergency room at the time the child was brought into the hospital. McGirt went to look at the victim because she was a friend of the victim's father and knew the child. After the other nurses told McGirt that the child had swallowed a piece of plastic, she asked Dr. Sabiston, the medical examiner, to remove it from the child's throat.

Using a laryngoscope and a Kelly clamp, Dr. Sabiston extracted a large piece of a plastic laundry bag from the child's throat. McGirt testified that when the plastic was removed from the victim's throat, it was tightly wadded up and came out in one piece, but it unfolded "like a flower" into a "big handful." Chrisco testified that the piece of plastic was large enough to cover her hand and three-fourths of her arm. There were no torn edges, teeth imprints, or bite or chew marks on the plastic. Dr. Sabiston placed the plastic in Manning's hands, and she threw it in the sink. The piece of plastic was later thrown away as trash.

On the victim's original death certificate, Dr. Sabiston stated that the death was accidental. The emergency room report filed in connection with the victim's death did not contain any information about the piece of plastic removed from the child's throat. Manning testified at trial that the piece of plastic was too large to have been swallowed by a human being, much less a four-year-old child. Chrisco testified that the piece of plastic could not have been swallowed accidentally. McGirt testified that it would have been impossible for her to swallow a piece of plastic as large as the one removed from the victim's throat. Manning and Chrisco claimed that they thought the victim's death was suspicious at the time; but despite their misgivings, neither pursued any further investigation into the death.

The State's evidence further tended to show that defendant gave differing versions of the events the day the victim died. The night after the child's death, defendant told the victim's grandparents that she left him playing in the breakfast room and went to the garage to get some string beans. When she returned, the boy was making noise and choking on plastic. Years later, defendant claimed that the child liked to pull plastic from the garment bags and pretend it was chewing gum. She claimed that on the morning of his death, she took plastic out of his mouth and then went to another room to get dressed. When she returned, the child had his head on the table. She said that she tried to remove the piece of plastic stuck in his throat but was unable to do so.

The State's evidence further tended to show that beginning in the spring of 1991, defendant conspired with Lynwood Taylor and Ernest Basden to kill her husband, Billy White, Sr. She had at least six meetings with Taylor to discuss her husband's murder. During one of these meetings between Taylor and defendant, Taylor expressed hesitation about taking someone's life, and defendant encouraged Taylor to murder her husband. Taylor testified that defendant told him, "[I]t's not that hard to do. I had a step-child. I put a bag over it until it stopped breathing. It was better off."

After defendant's arrest for her involvement in her husband's murder, the body of the victim in this case was exhumed. An autopsy on the body was performed by Dr. John D. Butts, Chief Medical Examiner of the State of North Carolina and an expert in forensic pathology. This autopsy revealed that the child had suffered a large fracture to the back of his skull several weeks before his death, which could have resulted from a serious fall onto a hard surface from a

considerable distance or by the child being struck in the back of the head with a blunt object with considerable force. After Dr. Butts reviewed the victim's records and conducted this physical examination of the victim's remains, he filed a supplemental death certificate in which he stated that the child's death had been a homicide caused by a bag being forced down his throat. Dr. Butts testified at trial that a four-year-old child could not have voluntarily swallowed a piece of plastic from a laundry bag as large as the one removed from the victim's throat because "it's going to tend to initiate the gag reflex and it's going to be very difficult if not, in my opinion, essentially impossible to voluntarily swallow."

Dr. Richard Page Hudson, Jr. testified that he had formerly been the Chief Medical Examiner of the State of North Carolina and that in his opinion a piece of plastic the size of the one found in the victim's throat could not have been swallowed by a child. In his judgment the plastic had been forced down the child's throat, and the death was a homicide.

The State's evidence also tended to show that a few weeks before his death, the victim had suffered several burns on his leg and ankle. According to Barbara Paderick, a neighbor of defendant's in 1973, defendant told her that one afternoon when she was at home alone with the victim, the child slipped out of the house and ignited a can of gasoline, resulting in severe burns on his leg and ankle. Paderick testified that the child's burns were covered in bandages and plastic wrap from his hip to his ankles. She further testified that defendant told her that the child kept pulling the plastic off his bandages and that if the child swallowed the plastic, it could hurt him.

Dr. Frederick Payne Dale testified that he treated the victim for these burns on 15 and 19 June 1973 and recommended covering them with a light bandage. He did not recommend covering the bandages with plastic wrap, which he testified would have been contrary to accepted medical treatment and would have increased the risk of infection.

Finally, the State's evidence tended to show that just prior to the victim's death, defendant had been named as a co-beneficiary of a $15,000 life insurance policy taken out on the life of the victim. Billy White, Sr.'s first wife had previously been named as the co-beneficiary; but on 20 June 1973, the policy was amended to name defendant as the co-beneficiary. This change was effective retroactively as of 15 June 1973, six days prior to the murder.

Defendant put on no evidence at trial.

[1] Defendant first contends that the trial court abused its discretion by erroneously denying her motion to continue this trial until after her capital trial in Jones County, North Carolina, for the murder of her husband. Defendant claims the denial of her motion for a continuance forced her to choose between (i) testifying in her own behalf in the instant case and waiving her constitutional privilege against self-incrimination in her capital trial or (ii) waiving her constitutional right to testify in this trial to preserve her right against self-incrimination in her capital trial.

Defendant argues that this "Hobson's choice" caused her to concede this case and enabled the State to later use this conviction as an aggravating circumstance in her capital trial. She argues that a continuance until after her capital prosecution would have resolved this dilemma and that a short delay would not have prejudiced the State in its prosecution of this twenty-year-old murder case. For the following reasons, we reject defendant's arguments.

Ordinarily a motion for continuance is addressed to the sound discretion of the trial judge and will not be disturbed on appeal absent a showing of abuse of that discretion. *State v. Stager*, 329 N.C. 278, 318, 406 S.E.2d 876, 899 (1991). "If the motion raises a constitutional issue, the trial court's action involves a question of law which is fully reviewable upon appeal." *Id.* (citing *State v. Branch*, 306 N.C. 101, 104, 291 S.E.2d 653, 656 (1982)). "The denial of a motion to continue, even when the motion raises a constitutional issue, is grounds for a new trial only upon a showing by the defendant that the denial was erroneous and also that his case was prejudiced as a result of the error." *Branch*, 306 N.C. at 104, 291 S.E.2d at 656.

A defendant cannot be required to surrender one constitutional right in order to assert another. *Simmons v. United States*, 390 U.S. 377, 394, 19 L. Ed. 2d 1247, 1259 (1968). A criminal defendant has a constitutional privilege against compulsory self-incrimination. U.S. Const. amend. V, XIV; N.C. Const. art. I, § 23. A criminal defendant further has a constitutional right to testify on her own behalf at trial if she so chooses. U.S. Const. amend. V, VI, XIV; N.C. Const. art. I, § 23. However, defendant's alleged "Hobson's choice" between asserting her privilege against self-incrimination and her right to testify on her own behalf is illusory. The trial court's denial of her motion for a continuance did not force defendant to choose between these two con-

**STATE v. WHITE**

[340 N.C. 264 (1995)]

stitutional rights but to make a purely tactical decision as to whether it would be more advantageous to testify in this trial, in her capital trial, in both trials, or not at all. Defendant would have faced the same dilemma regardless of which case was tried first since any incriminating statements made at the first trial could later be used against her at the second trial. The effect of the trial court's denial of her motion for a continuance was not a deprivation of one of these constitutional rights, but a deprivation of defendant's opportunity to select the order of her trials for her own tactical benefit.

[2] Defendant also argues that the trial court's summary denial of her motion was a miscarriage of justice and an abuse of discretion since the ruling was not supported by any findings or analysis indicating that the trial court had seriously considered the motion or the factors listed in N.C.G.S. § 15A-952(g). However, the facts presented in defendant's motion were not in dispute; therefore, the judge was not required to make specific findings of fact in denying defendant's motion for a continuance. *State v. Taylor*, 311 N.C. 266, 268, 316 S.E.2d 225, 226 (1984); *State v. Vaughn*, 296 N.C. 167, 175-76, 250 S.E.2d 210, 215-16 (1978), *cert. denied*, 441 U.S. 935, 60 L. Ed. 2d 665 (1979). The evidence before the trial court at the time the motion was heard clearly showed that none of the factors in N.C.G.S. § 15A-952(g) was present in this case. N.C.G.S. § 15A-952(g) (1992).

We conclude that the trial court did not abuse its discretion by denying defendant's motion for continuance or by its failure to make specific findings of fact to support denial of this motion.

[3] Next, defendant contends that the trial court erroneously refused to hold an *ex parte* hearing on her pretrial motions for funds to hire an investigator. In the order denying defendant's motion, the trial court made findings of fact as to the lack of a showing for particularized need and then concluded:

1.  There being no threshold showing of a particularized need for an investigator, the Defendant is not entitled to an *Ex Parte* Hearing.
2.  There being no threshold showing[,] the Court should not exercise its discretion to order an *Ex Parte* Hearing.

Defendant asserts that the trial court erred in concluding that she was not entitled to such an *ex parte* hearing on her motion because she had not first made a showing of particularized need for the assistance of a private investigator. She contends that she was entitled to an *ex*

*parte* hearing on a motion for funds to hire an investigator as a matter of right and that the trial court erred by failing to conduct such an *ex parte* hearing.

In *Ake v. Oklahoma*, 470 U.S. 68, 84 L. Ed. 2d 53 (1985), the United States Supreme Court recognized the right of an indigent criminal defendant to have an expert psychiatrist appointed to assist with his defense upon an "ex parte threshold showing to the trial court that his sanity is likely to be a significant factor in his defense." *Ake*, 470 U.S. at 82-83, 84 L. Ed. 2d at 66. This Court has followed *Ake* and has required for the appointment of other experts a threshold showing of a specific necessity or particularized need for expert assistance. *See State v. Moore*, 321 N.C. 327, 335, 364 S.E.2d 648, 652 (1988). To make a particularized showing of need for expert assistance, an indigent defendant must establish that "(1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that the expert assistance will materially assist him in the preparation of his case." *State v. Coffey*, 326 N.C. 268, 284, 389 S.E.2d 48, 58 (1990). The *Ake* "significant factor" test is satisfied when a defendant makes this particularized showing. *State v. Parks*, 331 N.C. 649, 656, 417 S.E.2d 467, 471 (1992).

In *State v. Phipps*, 331 N.C. 427, 449, 418 S.E.2d 178, 190 (1992), this Court concluded that an *ex parte* hearing is not always constitutionally required for a defendant to make a threshold showing of particularized need for expert assistance. The decision to grant an *ex parte* hearing is within the trial court's discretion. *Id.*

> The primary justification for an *ex parte* hearing is that it allows an indigent defendant to make a detailed showing, sufficient to meet the *Ake* threshold, of his need for expert assistance without alerting the prosecution to vital trial strategy and theories of defense. Though this is a desirable advantage, and one available to both the State and nonindigent defendants, we conclude that its absence does not necessarily render the trial of an indigent defendant fundamentally unfair.

*Id.* at 450, 418 S.E.2d at 190. Unlike access to the "basic tools of an adequate defense," the need for an *ex parte* hearing on a motion for expert assistance is not a core requirement for a fundamentally fair trial. *Id.* This Court has recognized the right of an indigent defendant to an *ex parte* hearing on a request for a psychologist or psychiatrist. *State v. Bates*, 333 N.C. 523, 428 S.E.2d 693, *cert. denied*, —— U.S. ——,

126 L. Ed. 2d 438 (1993); *State v. Ballard,* 333 N.C. 515, 428 S.E.2d 178, *cert. denied,* —— U.S. ——, 126 L. Ed. 2d 438 (1993). As stated in *Bates,*

> [b]oth psychologists and psychiatrists are trained to recognize and treat mental illness. Their training and expertise, and the fact that the subject of their study cannot be mechanically assessed, distinguishes them materially from such experts in physical evidence as fingerprint analysts. *See State v. Moore,* 321 N.C. 327, 348-49, 364 S.E.2d 648, 659 (1988) (Mitchell, J., concurring).

*Bates,* 333 N.C. at 527, 428 S.E.2d at 695.

Since the purpose of the *ex parte* hearing is for the trial court to determine whether defendant has made a threshold showing of a particularized need for an expert, we agree with defendant that the trial court improperly based the denial of the *ex parte* hearing on defendant's failure to make a threshold showing of a particularized need. We do not agree, however, with defendant's contention that the trial court erred in denying defendant's motion for an *ex parte* hearing. Applying the principles discussed above, we conclude that the request for an investigator is more analogous to a request for a fingerprint expert as in *Phipps* than to a request for a psychiatrist as in *Ballard.* We hold that defendant was not entitled as a matter of right to an *ex parte* hearing on her motion for funds to hire a private investigator. The trial court did not abuse its discretion by denying defendant's motion for an *ex parte* hearing or by considering her failure to make a showing of particularized need for the expert assistance without conducting such a hearing. Defendant has shown no prejudice from the denial of her motion, and we find no abuse of discretion on the part of the trial court.

[4] By her next assignment of error, defendant contends that the trial court committed plain error under *Cage v. Louisiana,* 498 U.S. 39, 112 L. Ed. 2d 339 (1990), by giving a reasonable doubt instruction during jury selection that reduced the State's burden of proof below the standard required by the Due Process Clause. Prior to trial, defendant requested that the prospective jurors be instructed on reasonable doubt pursuant to the North Carolina Pattern Instructions. Although defendant renewed this motion during jury selection, the trial court instructed the prospective jurors about reasonable doubt as follows:

> Members of the jury, let me tell you right now. Proof beyond a reasonable doubt is the standard in this case. It means that the State

must satisfy you from the evidence it presents. Satisfy you beyond a reasonable doubt means to satisfy you to a moral certainty in the truth of the charge. It is not a vain, imaginary or fanciful doubt, but is a sane, rational doubt which arises out of the evidence or lack of evidence or from the insufficiency of the evidence. It's proof which fully satisfies you or entirely convinces you of a defendant's guilt.

Later during jury selection, the trial court reiterated this explanation of reasonable doubt. Although the trial court correctly instructed on reasonable doubt in accordance with the North Carolina Pattern Instructions during its final instructions to the jury, defendant contends that these later instructions were insufficient to cure the plain error arising from the trial court's initial erroneous instruction.

Based on the United States Supreme Court's decision in *Victor v. Nebraska*, 511 U.S. ——, 127 L. Ed. 2d 583 (1994), and this Court's decisions in *State v. Bryant*, 337 N.C. 298, 446 S.E.2d 71 (1994), and *State v. Patterson*, 335 N.C. 437, 439 S.E.2d 578 (1994), we reject defendant's argument. The reasonable doubt instruction given during jury selection, when taken as a whole, correctly conveyed the concept of reasonable doubt to the jury. The trial court instructed the jury that it must be fully satisfied "to a moral certainty in the truth of the charge." As permitted by *Victor*, the rest of the court's instruction defined "moral certainty" and instructed the jury that its decision must be based on the evidence in the case. The instruction equated "moral certainty" with a "sane, rational doubt which arises out of the evidence or lack of evidence or from the insufficiency of the evidence." This instruction appropriately informed the jury that its decision must be based on the evidence in the case and put the term "moral certainty" in context. We conclude that there was no error, much less plain error, in the trial court's instruction on reasonable doubt during jury selection. Moreover, even if there were error in this preliminary instruction, the trial court's use of the pattern jury instruction in its charge to the jury before it retired for deliberation cured any possible defect in the earlier instruction.

[5] Next, defendant contends that the trial court erred as a matter of law by preventing her from exercising her right pursuant to N.C.G.S. § 15A-1214(c) to "personally question prospective jurors individually concerning their fitness and competency to serve as jurors in the case to determine whether there is a basis for a challenge for cause or whether to exercise a peremptory challenge." N.C.G.S. § 15A-1214(c)

(1988). In particular, defendant claims she was prevented from asking the prospective jurors whether the publicity surrounding the case or fear of later criticism would affect their verdict or their ability to be fair.

During jury selection, defense counsel inquired whether any of the jurors had seen or heard any pretrial publicity concerning the case. Defense counsel asked the jurors whether any of them had formulated an opinion about the guilt or innocence of defendant based on this pretrial publicity. The following exchange then occurred:

MR. WHITLEY [defense counsel]: O.K. The . . . I think by virtue of having ten out of twelve of you having seen or heard something about this case, it's obvious that this case has . . . has been the recipient of a great deal of news interest and news coverage. Would the fact that it would and perhaps even your decision about this case later may receive as much or more publicity, would . . . would that fact affect any of your ability to be completely fair and impartial to both sides in this case, including Mrs. White . . .

MISS PATE [prosecutor]: Objection.

MR. WHITLEY: . . . and if it . . .

COURT: Sustained.

MR. WHITLEY: Would any of you be . . . would all of you judge this case only on the evidence that's presented and not allow the fear of later criticism to affect your verdict? Would there any . . .

MISS PATE: Objection.

COURT: Sustained. I'll let them answer the first part of it.

Members of the Jury, are there any of you who would not base your verdict solely upon the evidence in the Courtroom? That is the only consideration, that and the law that applies to the evidence that you hear, is the only consideration in this case. It's entirely appropriate for Mr. Whitley to ask you that. Any other consideration is inappropriate. Any of you have any problem with deciding this case fairly, solely upon the evidence presented and the law that applies to that evidence? If so, raise your hand. (No response from the jurors)

After this exchange, defense counsel proceeded with a different line of questioning.

Defendant claims these questions were highly relevant to the determination of whether jurors were capable of rendering a fair and impartial verdict, whether they would make their decisions solely from the evidence presented at trial and not from publicity or fear of criticism, and whether there was a basis for a peremptory or for-cause challenge. For the following reasons, we reject defendant's arguments.

The purpose of jury *voir dire* is to eliminate extremes of partiality and ensure that the jury's decision is based solely on the evidence presented at trial. *State v. Leroux*, 326 N.C. 368, 384, 390 S.E.2d 314, 325, *cert. denied*, 498 U.S. 871, 112 L. Ed. 2d 155 (1990). The extent and manner of a party's inquiry into a potential juror's fitness to serve is within the trial court's discretion. *Id.* "Counsel may not pose hypothetical questions which are designed to elicit from prospective jurors what their decision might be under a given state of facts. Such questions are improper because they tend to 'stake out' a juror and cause him to pledge himself to a decision in advance of the evidence to be presented." *State v. Jones*, 339 N.C. 114, 134, 451 S.E.2d 826, 835 (1994) (citing *State v. Vinson*, 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), *death sentence vacated*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976)), *reconsideration denied*, 339 N.C. 618, 453 S.E.2d 188 (1995).

The questions posed here do not amount to a proper inquiry as to whether the jurors could base their decision solely on the evidence presented at trial. Whether the case would or would not attract future media attention or might subject jurors to criticism was purely speculative. Unlike pretrial publicity, which prospective jurors can evaluate, future publicity cannot be assessed. These questions were an attempt by the defense counsel to "stake out" the prospective jurors on how they would react to potential publicity during the trial and the possibility of facing critical public opinion if the verdict, either guilty or not guilty, was not popular. These questions were not likely to result in answers relevant to a juror's qualification to serve. The trial court did not abuse its discretion by sustaining the prosecutor's objections to defendant's questions. This assignment of error is overruled.

[6] By her next assignment of error, defendant asserts that the trial court erred in denying her motion for disclosure of all files pertaining to Lynwood Taylor's activities as a drug informant for the Lenoir County Sheriff's Department. Defendant filed a motion *in limine* for the disclosure of any files relating to Taylor's work as a drug inform-

ant for use in impeaching Taylor. The prosecutor confirmed that the Lenoir County Sheriff's Department had records relating to Taylor's activity as a drug informant but asserted that they should not be disclosed to defendant because the disclosure would be detrimental to ongoing police investigations. At a pretrial hearing, the trial court conducted an *in camera* review of these documents and determined that they did not contain any relevant, admissible, or impeaching evidence. The trial court sealed the records for appellate review. Defendant requests this Court to review these records and determine if they contain any relevant and impeaching evidence against Lynwood Taylor. We have reviewed the records thoroughly and have found no relevant, admissible, or impeaching evidence relating to Lynwood Taylor.

In *State v. Crandell*, 322 N.C. 487, 369 S.E.2d 579 (1988), this Court addressed a similar demand that the defendant be given access to information concerning a witness' activities as a police informant and past associations with law enforcement officers for impeachment purposes. This Court held that "[t]here is no statutory or other authority for the proposition that the information sought here is of the type properly subject to mandatory disclosure." *Id.* at 499, 369 S.E.2d at 586. As in *Crandell*, in this case defendant was aware that Taylor had acted as a police informant in the past and was free to use that information for impeachment purposes. This assignment of error is overruled.

**[7]** Next, defendant contends that the trial court erroneously and unconstitutionally admitted evidence of her alleged involvement in the murder of her husband in 1992. Defendant filed a pretrial motion *in limine* to exclude the·evidence at trial of her alleged involvement in her husband's murder, on the grounds that admission of this evidence would violate Rules 404(b) and 403 of the North Carolina Rules of Evidence and defendant's constitutional right to due process of law. This motion was denied by the trial court.

The trial court held a *voir dire* to determine the admissibility of Lynwood Taylor's testimony concerning defendant's involvement in the murder of her husband. The trial court made the following findings of fact and conclusions of law:

> 8. Prior to the killing, in one of the meetings in the Food Lion parking lot in Kinston, the defendant White in an effort to motivate Taylor to carry out the incipient murder conspiracy, made statements that she had killed her step-son, Billy C. White, II, by

placing a plastic bag over his head until he stopped breathing, saying to Taylor, "It's not that hard to do."

9. These statements are relevant and highly probative evidence in the case at Bar.

10. These statements, if accepted by the jury, refute the defense of accident.

11. The statements are evidence which are completely out of the context of the events in which they were delivered and therefore would be difficult for the jury to understand without the historical details which gave rise to the statements.

12. The relationship of the witness Taylor to the defendant is essential if the jury is to be able to decide upon the credibility of the witness Taylor and the weight, if any, to be accorded his testimony.

13. It is impossible to develop this relationship with evidence without revealing some of the evidence of the conspiracy to murder Billy C. White, Sr.

14. The events and the evidence of the inculpatory statements are so intertwined as to make it impossible to redact the prejudicial portions.

15. The evidence of the other crime or crimes is not offered as character evidence to prove she acted in conformity therewith.

16. Some portions of the evidence of the other crime or crimes form[] an integral and material part of an account of the matter on trial and is necessary to complete the story for the jury.

17. The probative value of the evidence is not limited solely to tending to establish the defendant's propensity to commit a crime such as the one charged.

18. The probative value of this evidence outweighs any prejudicial effect it might have.

Upon the foregoing Findings, the undersigned concludes as a Matter of Law:

1. That the "chain of circumstances" rationale established before the adoption of G.S. 8C-1, Rule 404(b) survives and is applicable to this case, and the proffered evidence is admissible under this rule.

2. Notwithstanding, under Rule 404(b), the probative value of the proffered evidence is not limited to tending to establish the defendant's propensity to commit a crime such as the one charged or as character evidence to prove she acted in conformity therewith, but the evidence is admissible to establish the credibility of the witness Taylor and to refute the defense of accident.

3. Under Rule 403, the probative value of the proffered evidence outweights [sic] any prejudicial effect it might have.

At trial and over defendant's renewed objections and motion for a limiting instruction, Taylor testified about defendant's alleged involvement in her husband's murder. Taylor testified that he met defendant in the spring of 1991, when she first asked him to kill her husband. At that time, she told Taylor that she unsuccessfully tried to poison her husband. Taylor testified that he met with defendant approximately six times over the next ten months to discuss the murder of her husband. Taylor indicated that he finally agreed to arrange for the murder and that his uncle, Ernest Basden, agreed to commit the murder for defendant. Taylor also testified that during one meeting between defendant and Taylor, defendant confessed to the murder of her stepchild. Taylor testified that after he told defendant he could not take a person's life, defendant encouraged him to commit the murder of her husband by telling him, "[I]t's not that hard to do. I had a step-child. I put a bag over it until it stopped breathing. It was better off."

Defendant does not assign error to the admission of her statement to Lynwood Taylor that she killed her stepchild but contends that the trial court erred as a matter of law by admitting the other evidence about her alleged involvement in the conspiracy to murder her husband. Defendant contends that this evidence was inadmissible under Rule 404(b) of the North Carolina Rules of Evidence to show absence of accident or to establish Taylor's credibility under a "chain of circumstances" rationale. Further, she contends that the only probative value of this evidence was to show that she had the propensity to commit murder and that because she had conspired to murder her husband, she must also have murdered her stepson twenty years before.

Rule 404(b) of the North Carolina Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident. Admissible evidence may include evidence of an offense committed by a juvenile if it would have been a Class A, B, C, D, or E felony if committed by an adult.

N.C.G.S. § 8C-1, Rule 404(b) (1994). This rule is "a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. at 278-79, 389 S.E.2d at 54. The list of permissible purposes for admission of "other crimes" evidence is not exclusive, and such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime. *State v. Bagley*, 321 N.C. 201, 362 S.E.2d 244 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988).

Evidence of other crimes committed by a defendant may be admissible under Rule 404(b) if it establishes the chain of circumstances or context of the charged crime. *State v. Agee*, 326 N.C. 542, 548, 391 S.E.2d 171, 174 (1990). Such evidence is admissible if the evidence of other crimes serves to enhance the natural development of the facts or is necessary to complete the story of the charged crime for the jury. *Id.* (citing *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985)).

In the instant case, the trial court found that the evidence of defendant's involvement in the conspiracy to murder her husband was necessary for the natural development of the facts and to complete the story of this murder for the jury, in particular, to explain the context of defendant's confession to Taylor that she murdered her stepchild by smothering him with a plastic bag. Her confession to Taylor would have been difficult to understand without the historical details and context giving rise to the statement. Absent evidence of defendant's relationship with Taylor, the jury would have been unable to determine Taylor's credibility or what weight to give his testimony. Even though the two incidents were separated by nineteen years, they were inextricably intertwined, and it would have been impossible to develop this relationship for the jury without revealing defend-

ant's participation in the conspiracy to murder her husband. This evidence was not merely probative of defendant's propensity to commit murder and was properly admitted under Rule 404(b).

Further, defendant's confession that she killed her stepchild by smothering him by placing a plastic bag over his head was an admission by a party opponent and therefore admissible as substantive evidence of her guilt and to refute her defense of accident. N.C.G.S. § 8C-1, Rule 801 (1992). Her incriminating statements were interwoven with the evidence of her participation in her husband's murder to such an extent that the prejudicial portions could not be redacted and her confession could not be understood without such evidence being presented to the jury. The trial court's findings of fact and conclusions of law make it clear that the evidence of defendant's confession to Taylor was admitted for the purpose of refuting accident and that the interwoven evidence of defendant's participation in her husband's murder was admitted for the purpose of establishing Taylor's credibility and the contextual basis for defendant's confession. This evidence was so intertwined that the trial court did not err in concluding that all the evidence was admissible under the "chain of circumstances" rule.

Defendant's reliance on *State v. Cashwell*, 322 N.C. 574, 369 S.E.2d 566 (1988), is misplaced. In *Cashwell*, the defendant made an inculpatory statement to his cellmate about the attempted murder of the defendant's girlfriend. *Id.* at 575, 369 S.E.2d at 567. A month later, the defendant made additional inculpatory statements to his cellmate about a different crime, a double murder, for which he was eventually tried. *Id.* At trial, the State introduced evidence of both statements on the theory that the first statement showed the relationship between the defendant and his former cellmate that led up to the inculpatory statement about the defendant's involvement in the double murders. *Id.* at 577, 369 S.E.2d at 568. This Court held that a month having passed between the making of the statements, the first statement was not necessary to show the context in which the second statement was made, and further, the first statement was not necessary to show a confidential relationship between the witness and the defendant. Hence, the statement was irrelevant and immaterial to the subsequent inculpatory statement. *Id.* at 578, 369 S.E.2d at 568.

Contrary to *Cashwell*, in the instant case knowledge of the relationship between Taylor and defendant was necessary in order for the jury to assess Taylor's credibility and determine what weight to give

his testimony concerning defendant's confession to this crime. Moreover, defendant's statement was inextricably intertwined with the evidence of defendant's alleged involvement in her husband's murder and could not be meaningfully isolated.

Defendant contends that even if this evidence was properly admitted under Rule 404(b), it was inadmissible under Rule 403 because any probative value of the evidence was outweighed by the danger of unfair prejudice to defendant. N.C.G.S. § 8C-1, Rule 403 (1992). "Whether to exclude relevant but prejudicial evidence under Rule 403 is a matter left to the sound discretion of the trial court." *State v. Handy*, 331 N.C. 515, 532, 419 S.E.2d 545, 554 (1992). "Evidence which is probative of the State's case necessarily will have a prejudicial effect upon the defendant; the question is one of degree." *State v. Coffey*, 326 N.C. at 281, 389 S.E.2d at 56. We conclude that the trial court did not abuse its discretion under Rule 403 by concluding that the probative value of the interwoven evidence of defendant's confession and involvement in her husband's murder outweighed any prejudicial effect such evidence might have had against her.

[8] In a related argument, defendant contends that the trial court erroneously instructed the jury that it could consider the evidence of defendant's involvement in her husband's murder to prove absence of accident. Defendant contends that the instruction was erroneous as a matter of law, was not supported by the evidence, and violated Rule 105 of the North Carolina Rules of Evidence because it allowed the jury to consider the evidence for an improper substantive purpose. Defendant argues that the trial court's instruction authorized the jury to use the evidence of her involvement in her husband's murder to prove that this victim's death was not an accident; to prove that defendant murdered this victim; and to prove that defendant acted with intent to kill, premeditation, and deliberation.

The trial judge did not give a limiting instruction at the time Lynwood Taylor testified concerning defendant's involvement in her husband's murder but indicated that he would give the instruction at the appropriate time during the final jury instructions. At the charge conference, defendant submitted a request for a special instruction on the use of the evidence of her involvement in her husband's murder, which the trial judge indicated he would give to the jury. During the final jury mandate, the trial judge instructed the jury on this issue in accordance with defendant's request as amended by the trial judge

to include an instruction on the use of this conspiracy evidence in determining the absence of accident. The instruction actually given by the trial court was as follows:

> Now, evidence in this case has been received by which the State alleges that the defendant, Sylvia Ipock White, conspired with James Lynwood Taylor for the murder of Billy C. White. That evidence cannot be considered by you in any manner in determining the defendant's guilt in this case. This evidence was received solely for the purpose of explaining the alleged statement and determining the credibility of the witness . . . the testimony of James Lynwood Taylor, *and also the State contends to show the absence of accident.* That is the sole reason this evidence of some other crime or alleged crime was received in this case and it may not be considered by you for any other purpose except the purposes about which I've instructed you.

(Emphasis added.)

We find no error in the instruction as given by the trial court. A trial judge is required to correctly instruct the jury on the law arising from the evidence presented at trial. N.C.G.S. §§ 15A-1231, -1232 (1988). This instruction was consistent with the trial court's findings of fact and conclusions of law in connection with the admission of this "other crimes" evidence. Contrary to defendant's contention, this instruction did not authorize the jury to make an improper use of this evidence. As indicated above, the trial court properly admitted all the interwoven evidence of defendant's involvement in her husband's murder to establish Taylor's credibility and to refute the defense that this death was an accident. It is highly unlikely that the jurors were confused as to which portion of the evidence was relevant to Taylor's credibility and which portion was relevant to absence of accident.

Further, the trial court correctly limited the consideration of this evidence to the determination of Taylor's credibility and absence of accident. The trial judge specifically instructed the jury that it could not consider this evidence in any other manner in determining defendant's guilt, and defendant's contention that the instruction specifically authorized the jury to use this evidence to prove she acted with intent to kill, premeditation, and deliberation is without merit.

[9] In another related argument, defendant contends that the trial court erroneously refused to rule on her motion *in limine* to prohibit

the prosecutor from cross-examining her with the allegedly inadmissible evidence of her involvement in her husband's murder. Prior to trial, defendant filed a motion *in limine* to exclude all evidence of her involvement in her husband's murder, which was denied by the trial court. Defendant contends that this motion *in limine* explicitly encompassed a request to prohibit the prosecutor from cross-examining her about that evidence should she testify. Defendant renewed this argument at trial when the State sought to introduce this evidence through the testimony of Lynwood Taylor, and again the trial court refused to rule on whether the State would be able to cross-examine defendant about this "other crimes" evidence.

Defendant argues she would have testified at trial if the trial court had ruled on her motion. Relying on *State v. Lamb*, 321 N.C. 633, 365 S.E.2d 600 (1988), defendant contends that the trial court's failure to rule on her motion impermissibly chilled her exercise of her constitutional right to testify on her own behalf. We reject defendant's arguments.

In *State v. Lamb*, this Court held that a defendant's constitutional right to testify can be "impermissibly chilled" if, in response to a motion *in limine* to prohibit cross-examination about impermissible evidence of other crimes, she "never receive[s] any assurance that, should she testify, provided she [does] not open the door, she would be protected from impermissible evidence being used to impeach her." *Id.* at 649, 365 S.E.2d at 609.

Defendant's reliance on *State v. Lamb* is misplaced. In that case, this Court held that the trial court's failure to rule on a motion *in limine* to prohibit cross-examination about impermissible "other crimes" evidence violated the defendant's constitutional right to testify on her own behalf. *Id.* However, in the instant case, the "other crimes" evidence had been properly ruled admissible pursuant to Rule 404(b) under the "chain of circumstances" rule. A criminal defendant's decision not to testify based on the introduction of competent admissible evidence against her is purely a tactical decision that does not implicate any of her constitutional rights. As there was no threat that impermissible evidence would be used to cross-examine defendant, she was not impermissibly discouraged from testifying at trial. The State could have legitimately cross-examined defendant about her involvement in her husband's murder for impeachment purposes to the extent allowable under Rule 608(b) of the North Carolina Rules of Evidence to the extent such evidence was probative of defendant's

truthfulness or to the extent that defendant "opened the door" to such testimony. N.C.G.S. § 8C-1, Rule 608(b) (1992); *State v. Lamb*, 321 N.C. at 649, 365 S.E.2d at 609. Although this evidence was not probative of defendant's truthfulness and apparently inadmissible pursuant to Rule 608(b), the trial court could not know if defendant would "open the door" to cross-examination about her involvement in her husband's murder until defendant testified. There was no error in the trial court's refusal to rule on defendant's motion *in limine* to prohibit cross-examination about this "other crimes" evidence.

**[10]** Next, defendant contends that the trial court erred in admitting into evidence over defendant's objections a photograph depicting the victim lying in his casket in a funeral home shortly before his burial in 1973. This photograph was admitted during the testimony of Charles White, the victim's uncle, who testified that he saw the victim after his death in the funeral home, that the victim looked like he was asleep in peace, and that this picture fairly and accurately depicted what the victim looked like at that time. Defendant argues that the photograph was not relevant to any fact at issue in this case and was aimed solely at inflaming the jury against defendant. She further contends that even if relevant, this evidence should have been excluded because any slight probative value was outweighed by the danger of unfair prejudice to defendant. We disagree.

"Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988). In a homicide case, a photograph of the victim's body depicting the condition of the body or its location when found is competent despite its portrayal of a gruesome scene; this is true even if the cause of death is uncontroverted. *State v. Harris*, 323 N.C. 112, 127, 371 S.E.2d 689, 698 (1988).

Based on the foregoing principles, this photograph of the victim's body was properly admitted by the trial court. This evidence was relevant and admissible to depict the condition of the victim's body near the time of his death. No autopsy or criminal investigation was conducted at the time of the victim's death in 1973, and no photographs were taken of the victim as he appeared at the time of his death, other than this photograph of the victim lying in his casket. When his body was exhumed in 1992, only his bones remained. This photograph was

the only physical evidence to illustrate the testimony of Charles White about the condition of the victim's body shortly after the time of his death.

Further, this photograph and the accompanying testimony were relevant to establish the *corpus delicti* of this crime. In any criminal case, the State has the burden to prove that a crime was committed and that the defendant committed it. The evidence that a crime was committed is referred to as the *corpus delicti,* and in addition to showing the criminal agency of the defendant, the State must produce the corpse or circumstantial evidence so strong that there can be no doubt of death. *State v. Dawson,* 278 N.C. 351, 180 S.E.2d 140 (1971). Other than the victim's death certificate, this photograph was the only physical evidence that a death had occurred.

The exclusion of photographic evidence under the balancing test of Rule 403 of the North Carolina Rules of Evidence is generally left to the discretion of the trial court. *State v. Hennis,* 323 N.C. at 285, 372 S.E.2d at 527. In light of the probative value of this photograph, we conclude the trial court did not abuse its discretion in admitting this evidence.

[11] Next, defendant contends that the trial court erroneously admitted evidence that the victim suffered from a skull fracture and severe burns on his leg and ankle several weeks before his death. Defendant argues that this evidence was irrelevant and inadmissible because the prior injuries were not medically related to the victim's death and there was no evidence that she was the person responsible for those prior injuries. She further argues that this evidence was not probative of any matter other than defendant's character for violence and that therefore its admission was prejudicial error under Rule 404(b) of the North Carolina Rules of Evidence. We reject defendant's arguments for the following reasons.

The evidence was sufficient for a reasonable juror to infer defendant's responsibility for the victim's skull fracture and serious ankle and leg burns. The evidence showed that the victim was severely burned on his leg and ankle at a time he was at home alone with defendant, when he allegedly slipped out of the house and ignited a can of gasoline. There was also evidence that defendant wrapped these burns in bandages and plastic wrap, contrary to accepted medical treatment. The victim suffered a severe skull fracture approximately two weeks before his death, at a time he would have been at home with defendant while recovering from his burns.

Hence, a basis existed for the jury to infer that defendant was responsible for these prior injuries.

The evidence the victim suffered from a severe skull fracture and serious burns shortly before his death was relevant to the jury's determination of whether defendant was criminally negligent. One of the lesser-included offenses of first-degree murder submitted to the jury as a basis for conviction was involuntary manslaughter based on recklessness or carelessness. Involuntary manslaughter has been defined as "the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission." *State v. Powell*, 336 N.C. 762, 767, 446 S.E.2d 26, 29 (1994) (citing *State v. Greene*, 314 N.C. 649, 336 S.E.2d 87 (1985)). Evidence that during the time he was home under defendant's sole supervision, the victim obtained matches and ignited a can of gasoline, resulting in severe burns on his leg and ankle, was relevant to the determination of whether defendant had a pattern of reckless or careless supervision of the child. The fact that the child suffered a severe skull fracture during the same time period and the fact that defendant wrapped the child's burns in plastic wrap, in spite of his alleged habit of putting the plastic in his mouth and her knowledge that the plastic could hurt him, were likewise relevant to the issue of defendant's criminal negligence.

Further, this evidence was relevant and admissible under Rule 404(b) as proof of defendant's preparation and planning for the commission of this crime and that the victim's death was not accidental. Rule 404(b) authorizes the admission of prior bad acts or other crimes for purposes other than proving defendant's character for committing such acts, including proof of preparation, plan, and absence of accident. N.C.G.S. § 8C-1, Rule 404(b). From the evidence that defendant continued to cover the victim's burns with plastic wrap even though she told a neighbor she knew he liked to chew on it and it could hurt him, the jury could reasonably infer that defendant was setting the stage for the victim to strangle to death on a piece of plastic, either by accident or with her assistance.

We conclude the trial court did not err in admitting the evidence that the victim suffered from a skull fracture and serious burns on his ankle and leg shortly before his death.

[12] Defendant next contends that the trial court committed reversible error by admitting irrelevant evidence concerning the vic-

tim's life insurance policy, in violation of her right to a fair trial. At trial, Bill McAmis, a Jefferson Pilot Life Insurance representative, testified that on 15 June 1973, six days before the victim's death, defendant's husband amended the victim's life insurance policy to designate defendant as a co-beneficiary. McAmis testified that the change of beneficiary was approved on 20 June 1973 and mailed to Billy White, Sr. at his office address. McAmis further testified that both defendant and her husband received periodic lump-sum payments from this insurance policy over the next five years. Defendant claims that this evidence was irrelevant to prove her motive for the crime and that its erroneous admission was highly prejudicial. She maintains that there was no direct evidence that she knew about the policy or its amendment to designate her as a beneficiary and that there was insufficient circumstantial evidence from which the jury could infer that she had such knowledge. We reject defendant's arguments.

Although the State is not required to prove motive as an element of first-degree murder, evidence of motive is relevant when it has a tendency to show that the defendant committed the crime at issue. *State v. Hightower*, 331 N.C. 636, 642, 417 S.E.2d 237, 240-41 (1992). "The prosecution may offer evidence of motive as circumstantial evidence to prove its case where the commission of the act is in dispute when '[t]he existence of a motive is, however, a circumstance tending to make it more probable that the person in question did the act[.]' " *Id.* (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 83 (3d ed. 1988)).

In the instant case, evidence that defendant became one of the beneficiaries of an insurance policy on the victim's life days before he was killed was relevant to show her motive for murdering her stepson. This evidence tended to prove that defendant murdered the victim, at least in part, to collect the insurance proceeds from the victim's life insurance policy.

The jury could reasonably infer from the evidence at trial that defendant had at least some knowledge of the change in the victim's insurance policy to name her as a co-beneficiary. Defendant's husband was a life insurance agent, and the jury could reasonably infer that defendant, as his spouse, knew that the lives of the family members were insured and that defendant's husband would have discussed with defendant the decision to name defendant as a co-beneficiary of the victim's life insurance policy in place of the child's natural mother.

All circumstances calculated to throw any light on the alleged crime are admissible, and the weight to be accorded such evidence is for the jury to decide. *State v. Mason*, 337 N.C. 165, 172, 446 S.E.2d 58, 62 (1994). The extent of defendant's knowledge about this insurance policy impacted only on the weight to be accorded the evidence by the jury and not its admissibility.

**[13]** Next, defendant contends that the trial court erroneously admitted the opinion testimony of three nurses who were in the emergency room when the victim was brought in and witnessed a piece of plastic being removed from the victim's throat. Peggy Chrisco and Susan Manning each testified that in her opinion, the piece of plastic could not have been accidentally swallowed by the victim. Anita McGirt testified that she did not think she personally could have swallowed a piece of plastic as large as the one removed from the victim's throat. Defendant contends that this opinion testimony was inadmissible under Rule 702 of the North Carolina Rules of Evidence for the following reasons. First, their testimony involved scientific, technical, and specialized knowledge; but the trial court never determined they were qualified to testify as expert witnesses, and they were never formally tendered by the State or accepted by the trial court as experts. Second, even if the trial court implicitly accepted them as expert witnesses, these nurses were not qualified to testify as expert witnesses. Third, even if these nurses were qualified to testify as experts, their evidence did not assist the jury in determining any fact in issue, and the jury was in a better position to determine if the victim's death was accidental. We do not find defendant's arguments persuasive.

Rule 702 provides:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education[] may testify thereto in the form of an opinion.

N.C.G.S. § 8C-1, Rule 702 (1992).

While the better practice may be to make a formal tender of a witness as an expert, such a tender is not required. *State v. Mitchell*, 283 N.C. 462, 467, 196 S.E.2d 736, 739 (1973). Further, absent a request by a party, the trial court is not required to make a formal finding as to a witness' qualification to testify as an expert witness. *Id.* Such a finding has been held to be implicit in the court's admission of the testi-

mony in question. *Id.*; *see also State v. Perry*, 275 N.C. 565, 169 S.E.2d 839 (1969) (implicit finding of medical witness' qualification as an expert by admission of his testimony). Defendant must specifically object to the qualifications of an expert witness in order to preserve the objection. *State v. Riddick*, 315 N.C. 749, 758, 340 S.E.2d 55, 60 (1986). In this case, by overruling defendant's objections, the trial court implicitly accepted Chrisco, Manning, and McGirt as expert witnesses. By failing to specifically object to their qualifications at trial, defendant has waived her right to raise that issue on appeal.

Even if defendant had properly preserved this challenge to the nurses' qualifications, we conclude that these three nurses were in fact qualified to render their opinions as experts about the possibility that the victim accidentally swallowed the piece of plastic on which he choked to death. Nurses are qualified to render expert opinions as to the cause of a physical injury even though they are not licensed to diagnose illnesses or prescribe treatment, and there is no basis for any preference of licensed physicians for such medical testimony. *See Maloney v. Wake Hospital Systems, Inc.*, 45 N.C. App. 172, 178-79, 262 S.E.2d 680, 684, *disc. rev. denied*, 300 N.C. 375, 267 S.E.2d 676 (1980). All three witnesses were licensed nursing professionals in 1973, and each had specialized knowledge, skill, experience, training, and education that could help the jury understand relevant medical evidence. *See* N.C.G.S. § 8C-1, Rule 702. Each of these nurses was present when Dr. Sabiston removed the piece of plastic from the child's throat and had firsthand knowledge of the size of the plastic and the physical condition of the victim. These three nurses were in a better position than the jurors to know if it was physically possible for a piece of plastic the size of the one removed from the victim's throat to be accidentally swallowed or inhaled so deeply into the victim's throat that it could not be seen at first.

Additionally, defendant contends that Chrisco's testimony that the victim's death was not accidental was erroneously admitted because it did not address any factual issue in this case but constituted impermissible evidence that a particular legal standard had not been met. There are limits on the admissibility of expert witness testimony. "[U]nder the . . . rules of evidence, an expert may not testify that a particular legal conclusion or standard has or has not been met, at least where the standard is a legal term of art which carries a specific meaning not readily apparent to the witness." *State v. Ledford*, 315 N.C. 599, 617, 340 S.E.2d 309, 321 (1986) (error, but not prejudicial, to admit expert opinion that certain injuries were the "proximate

cause" of death). However, in the instant case, these three expert witnesses testified about the facts to be determined by the jury and did not render opinions as to the legal standard the jury should follow. Peggy Chrisco was the only witness who used the term "accident" in her testimony, and it is clear that she was using the term as a "shorthand statement of fact," rather than as a legal term of art or an opinion as to the legal standard the jury should apply. *See State v. Williams*, 319 N.C. 73, 78, 352 S.E.2d 428, 432 (1987). The trial court did not err by admitting this expert witness testimony.

[14] In her next assignment of error, defendant contends that the trial court committed reversible error by excluding evidence about the competency of Dr. Sabiston, the medical examiner who removed the piece of plastic from the victim's throat and signed the victim's original death certificate in 1973 stating that the death was accidental. Defendant sought to ask Anita McGirt, who had worked with Dr. Sabiston for twenty years, about Dr. Sabiston's general reputation among the medical community in Kinston, North Carolina. The prosecutor's objection to this testimony was sustained, and an offer of proof was made outside the jury's presence. During this offer of proof, Anita McGirt testified that Dr. Sabiston's reputation as a doctor was good. Neither the State nor defendant called Dr. Sabiston to testify during trial.

Defendant contends the trial court erred by excluding this testimony, which defendant argues was admissible under Rule 611(b) and Rule 806 of the North Carolina Rules of Evidence. The State allegedly opened the door to this evidence by introducing the original death certificate filed by Dr. Sabiston, upon which defendant's entire defense was based, and by attacking his credibility and competency throughout the trial. We reject defendant's arguments.

Rule 611(b) is a general rule relating to the scope of cross-examination and provides that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." N.C.G.S. § 8C-1, Rule 611(b) (1992).

Defendant contends that evidence of Dr. Sabiston's reputation was relevant because the State attacked his competency as a doctor and his medical conclusions about the cause of the victim's death. Defendant refers us to several places in the transcript where the prosecution allegedly attacked Dr. Sabiston's credibility or competency; however, an examination of these references reveals that the prosecution merely disputed his conclusion that this death was accidental

and offered the evidence of Peggy Chrisco, Susan Manning, and Anita McGirt in support of its contention that the victim's death was not accidental. Defendant also refers us to a portion of the prosecutor's final jury argument in which the prosecutor argued that Dr. Sabiston's opinion that this was an accidental death was under frontal attack. Again, we note that this argument was not an attack on Dr. Sabiston's credibility or competency but merely on his investigation and conclusions in this particular instance. Furthermore, this argument was based on reasonable inferences from the testimony of Peggy Chrisco, Susan Manning, and Anita McGirt and did not exceed the wide latitude allowed counsel in jury arguments. *See State v. Soyars*, 332 N.C. 47, 418 S.E.2d 480 (1992). We conclude that the prosecutor did not open the door to the admission of testimony about Dr. Sabiston's general reputation in the medical community.

Additionally, we note that Dr. Sabiston's current general reputation for competency in the medical community has no logical probative value on whether his twenty-year-old opinion about this murder was accurate and supported by an adequate and thorough investigation. The trial court did not err by refusing to admit this evidence pursuant to Rule 611(b).

The evidence of Dr. Sabiston's good reputation in the medical community was also inadmissible under Rule 806, which provides that "[w]hen a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness." N.C.G.S. § 8C-1, Rule 806 (1992). Assuming *arguendo* that Dr. Sabiston's statement on the original death certificate indicating this death was accidental is hearsay covered by this Rule, evidence of Dr. Sabiston's reputation for competency in the medical community was admissible only if this evidence would have been admissible to support his credibility if he had testified at trial. Pursuant to Rule 608(a) of the North Carolina Rules of Evidence, the credibility of a witness may be supported by reputation evidence only if it refers to the witness' character for truthfulness and only after the witness' character for truthfulness has been attacked. N.C.G.S. § 8C-1, Rule 608(a) (1992). Therefore, assuming Dr. Sabiston's reputation for competency as a doctor had been attacked in this case, this evidence of his competency was not probative of his character for truthfulness and would not have been admissible. The trial court did not err by refusing to admit this evidence pursuant to Rule 806.

**[15]** Defendant next contends that the trial court committed prejudicial error on two occasions when it improperly expressed its opinion against her and violated her right to a fair and impartial trial, in violation of N.C.G.S. § 15A-1222. A trial judge must be completely impartial and "may not express during any stage of the trial[] any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1988). "When remarks from the bench tend to belittle and humiliate counsel, defendant's case can be seriously prejudiced in the eyes of the jury." *State v. Frazier*, 278 N.C. 458, 462, 180 S.E.2d 128, 131 (1971). However, if a defendant is not prejudiced by a judge's remarks, they will be considered harmless. *State v. Weeks*, 322 N.C. 152, 158, 367 S.E.2d 895, 899 (1988). After examining the comments made by the trial court, we conclude there was no violation of N.C.G.S. § 15A-1222.

The first comment defendant contends was an improper expression of opinion against her occurred during the trial court's preliminary remarks to the prospective jurors. During these remarks, the trial judge stated that

Mrs. White is here upon an accusation of murder in the first degree. This is an accusation which she denies. It's alleged to have happened on the 21st of June, 1973 and involves the death of one Billy C. White, II. As I said, she denies this charge, says it[']s not true, and she ought not to be here and will require the State to prove her guilt to twelve jurors from the evidence and beyond a reasonable doubt.

Defendant contends that the last sentence, which emphasized the heavy burden the State must bear to prove her guilt, improperly denigrated her plea of not guilty and suggested that her trial was merely a formality. Defendant argues that the jury could reasonably have deduced from this statement that the trial court believed that defendant was guilty and was placing improper demands on the State by pleading not guilty.

A fair reading of the trial court's entire statement in context reveals, however, that the trial court was accurately instructing the jury about defendant's presumption of innocence and the State's burden to prove every material element of its charges beyond a reasonable doubt. The trial court has a duty to inform the prospective jurors of the charge, the date of the alleged offense, the name of the victim, the defendant's plea, and any affirmative defense that will be raised at trial. N.C.G.S. § 15A-1213 (1988). These statements were accurate

statements of the law and were made in accordance with the trial court's obligation to inform the prospective jurors about the case pursuant to this statute.

The second statement by the trial court that defendant contends was an improper expression of opinion against her occurred during the cross-examination of State's witness, Susan Manning. On cross-examination, Manning admitted that she spoke with the police and the prosecutor about the victim's death but refused to speak with defense counsel. The following exchange then occurred:

Q. Now, you met with the officers who investigated this case, did you not?

A. Yes sir.

. . . .

Q. And we asked . . . we called you and asked if we could talk to you, didn't we?

A. Yes sir.

Q. And we . . . we told you that we would just like to ask you some questions about what you knew about the case and we told you that we'd be glad to meet you anywhere you'd like to and at any time, did we not?

A. Right.

Q. And you told us you didn't want to do that and you wouldn't talk to us. Isn't that right?

A. No. I said I didn't want to discuss it any more. I had discussed it and it was just . . . I have a heart condition and I just didn't want to keep talking about it. I knew I had to go through this in Court and I wanted to do that and . . . but I . . . I just didn't want to keep talking about it with attorneys.

Q. So you didn't talk to us?

A. No, I did not.

Q. You refused to talk to us, didn't you.

A. I sure didn't.

COURT: You can talk to her now, Mr. Whitley.

MR. WHITLEY: Yes sir . . .

COURT: All you want to.

Outside the presence of the jury, defense counsel argued that the trial court's comment had disparaged him in front of the jury thereby prejudicing defendant. The trial judge then recalled the jury and resumed trial without any further discussion of his comment.

Defendant claims the trial court's comment invoked sympathy for the witness, belittled and humiliated defense counsel, blocked legitimate cross-examination, and was nothing less than an improper endorsement of Manning's credibility in a calculated attempt to prejudice defendant.

In light of the context in which the trial court's comment was made, we hold that the trial court's comment did not constitute error. The trial court has a duty to control the examination of witnesses, both for the purpose of conserving the trial court's time and for the purpose of protecting the witness from prolonged, needless, or abusive examination. *See State v. Frazier*, 278 N.C. at 462, 180 S.E.2d at 131. In performing this duty, the trial court must not intimate any opinion about the witness or her credibility. *Id.* The trial court's remark in this case was intended to end defense counsel's badgering of the witness about her refusal to talk to the defense prior to trial. Defense counsel's badgering of this witness created the necessity for the trial court to intercede to cut off this questioning, and the trial court's comment did not increase any prejudice to defendant arising out of the conduct of her own attorney. Defendant had already successfully placed all the evidence of Susan Manning's refusal to talk to the defense and her possible bias before the court. We conclude that the trial judge's comment does not constitute reversible error.

[16] Next, defendant contends that the trial court committed plain error by failing to include the alternative option of "not guilty by reason of accident" in its final mandate to the jury. As defendant failed to object to the trial court's failure to include such an instruction in its final mandate or request that such an instruction be given, plain error analysis applies. *State v. Collins*, 334 N.C. 54, 431 S.E.2d 188 (1993). In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected. *Id.* at 62, 431 S.E.2d at 193. We conclude there was no error, much less plain error, in the trial court's instructions.

STATE v. WHITE

[340 N.C. 264 (1995)]

Although the trial court did not submit the option of finding defendant "not guilty by reason of accident" to the jury in its final mandate, it did instruct the jury on accident as a theory of acquittal. The trial court instructed as follows:

> If the victim died by accident or misadventure, that is, without any wrongful purpose or criminal negligence on the part of the defendant, the defendant would not be guilty. The burden of proving accident is not on the defendant. Her assertion of accident is merely a denial that she has committed any crime. The burden remains on the State to prove the defendant's guilt beyond a reasonable doubt, thus that the death was not a result of accident or misadventure. Failing this it would be your duty to return a verdict of not guilty.

The substance of this instruction was accurate and free from error. The instruction was provided as a theory of acquittal after the trial court's discussion of involuntary manslaughter. This instruction immediately preceded the final mandate, which included an instruction on a possible verdict of not guilty for each crime of which defendant could have been convicted.

This Court rejected a similar argument in *State v. Joplin*, 318 N.C. 126, 347 S.E.2d 421 (1986), in which the trial court had instructed on accident as a theory of acquittal but had not repeated the instruction in its final mandate to the jury. This Court held:

> Inasmuch as the jury found defendant guilty of first degree murder and the trial court instructed on accident as a theory of acquittal, we are not convinced the result of this trial would have been different had the trial court repeated the theory of acquittal by accident in his first mandate. This omission, even if error (a point we do not decide), is obviously not plain error.

*Id.* at 132-33, 347 S.E.2d at 425. We conclude that in the instant case, the trial court did not err, much less commit plain error, by failing to repeat during the final jury mandate the theory of accident as a basis for acquittal.

We hold that defendant received a fair trial free from prejudicial error.

NO ERROR.