***********
Upon review of the competent evidence of record with reference to the errors assigned, and considering the briefs and oral arguments of the parties, the Full Commission finds that the appealing party has not shown good grounds to receive further evidence or to rehear the parties or their representatives. The Full Commission, upon reconsideration of the evidence, affirms the Opinion and Award of the Deputy Commissioner with significant modifications and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were agreed upon by the parties in the Pre-Trial Agreement as: *Page 2 
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and named employer at the times in question.
3. The carrier liable on the risk is correctly named above.
4. The employee's average weekly wage is $360.00 per week.
5. The employee sustained an injury (or started missing time from work because of disease) on or about August 27, 2006, with the exact date to be determined by the Industrial Commission.
6. The injury/disease arose out of and in the course of employment and is compensable.
7. Various medical records and other documents have been stipulated into evidence with the Pre-Trial Agreement.
8. Issues for decision are:
a. Whether a pain clinic recommended by Dr. Robert Yapundich and his P.A. Rita Katz should be approved.
b. Whether the employee is still disabled. Whether the employee's leg give-way symptoms are related to his injury.
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following: *Page 3 
 FINDINGS OF FACT
1. Plaintiff worked as a sanitation worker for defendant-employer beginning June 1, 2006. The job of sanitation worker required frequent bending to pick up items from the floor and lifting up to 100 lbs.
2. On Sunday, August 27, 2006 at 10:20 a.m., plaintiff sustained a back injury while attempting to unload a heavy bin of garbage with potatoes and cantaloupes in it into a large compactor. The bin became overbalanced, and plaintiff injured his back when he tried to prevent the bin from falling into the compactor. Plaintiff had the immediate onset of neck and low back pain. Defendants admitted the plaintiff's right to compensation for this injury on a Form 60 dated November 9, 2006.
3. While working for defendant-employer plaintiff also worked part-time, 24 hours per week, as an unarmed security guard. This job primarily involved riding around in a golf cart and riding up and down elevators. Plaintiff continued to work as a part-time security guard through the date of hearing before the Deputy Commissioner.
4. On August 28, 2006 defendants sent plaintiff to Dr. Baxter Leonard for treatment. Plaintiff complained of neck, mid-back and lower back pain. Dr. Leonard's assessment was neck pain, secondary to cervical strain and spasm, mid-back pain, secondary to musculoskeletal etiology, and lower back/lumbar pain secondary to lumbar spasm. Dr. Leonard referred plaintiff for x-rays, prescribed medications (Flexeril and Tramadol), recommended light duty and gave plaintiff a follow-up appointment for September 5, 2006. Dr. Leonard noted in his medical records that plaintiff had pre-existing reflex sympathetic dystrophy involving the left hand and wrist and that he was taking Hydrocodone and Neurontin. *Page 4 
5. Upon referral of Dr. Leonard, plaintiff presented to Dr. Jeffrey Knapp, an orthopaedic surgeon, for evaluation of his lumbar spine pain on September 6, 2006. Dr. Knapp assessed "lumbar strain syndrome" and recommended physical therapy and continued light duty work with restrictions of limited bending, maximum lifting of 5 lbs. and alternating between sitting and standing as needed. If these restrictions could not be accommodated, plaintiff was directed to stay out of work. Plaintiff's maximum lifting restriction was changed to 5-10 lbs. on September 14, 2006.
6. Defendant-employer provided plaintiff a job within these restrictions. Plaintiff's job title was "safety auditor." He was required to go around in the workplace looking for safety violations.
7. Plaintiff returned to Dr. Knapp on September 27, 2006 without an appointment. Plaintiff reported that his right leg gave out on him and he fell backwards, but caught himself before he hit the ground. Dr. Knapp ordered an MRI of plaintiff's lumbar spine, which was done on October 10, 2006. Dr. Knapp felt the MRI was essentially normal and continued physical therapy and the same work restrictions, except plaintiff's lifting was again limited to 5 lbs on October 13, 2006. Defendant-employer would not allow plaintiff to continue working after his leg began to give way.
8. At plaintiff's November 29, 2006 visit to Dr. Knapp, plaintiff was still complaining of disabling back pain, but he was also complaining of severe neck pain. Dr. Knapp ordered an MRI of plaintiff's cervical spine, which he interpreted as showing very small central disc bulges at C5-6 and C6-7 without significant nerve compression. Since Dr. Knapp could not find any area of severe compression in the cervical or lumbar spine to account for the leg giving way and neck pain, he referred plaintiff to a neurologist for an evaluation. *Page 5 
9. Dr. Knapp was of the opinion that plaintiff had "lumbar strain syndrome" which was caused by his injury at work. He was unable to relate plaintiff's leg giving way to the back injury, but suspected that the leg giving way may have been psychogenic in nature, stress related or due to muscle spasms. He testified that sometimes muscle spasm will give the sensation that the leg is not there.
10. Plaintiff presented to the office of Dr. Robert Yapundich for a neurological evaluation on January 11, 2007. Rita Katz, a nationally certified physician's assistant with 28 years of medical experience saw plaintiff. She is supervised by Dr. Robert Yapundich, a board certified neurologist. Plaintiff complained of sudden weakness in his right leg and of falling. Plaintiff underwent nerve conduction studies and EMG testing which produced normal results. An MRI of the brain indicated normal brain aging. P.A. Katz recommended that plaintiff be referred to pain management for treatment of his right leg and back pain. She testified that Dr. Yapundich agreed with this recommendation.
11. P.A. Katz opined that the most likely cause of the plaintiff's leg giving way was muscle spasms and low back pain from the injury at work. In reaching her opinion, P.A. Katz considered that the plaintiff's condition was improved by use of certain medications, the tests for other causes of his condition were negative and that muscle spasms can produce sudden weakness or leg give way.
12. On June 14, 2007 Dr. Knapp placed plaintiff on permanent restrictions of 25 lbs. lifting and limited bending as a result of his injury. He assigned a zero percent rating to the back because it is his philosophy to assign no rating when he cannot point to a specific test result to confirm his diagnosis of a soft tissue, lumbar strain. Dr. Knapp does not disagree with the neurologist's recommendation that plaintiff seek treatment at a pain clinic. *Page 6 
13. Dr. Maher Habashi is a board certified orthopaedic surgeon, whose practice includes spine surgery. Dr. Habashi evaluated plaintiff on September 27, 2007 for back and right leg pain. Plaintiff gave a history of a work injury on August 27, 2006 resulting in back and neck pain and his right leg giving way. He reported that he had no pre-injury back or right leg problems. Dr. Habashi examined plaintiff. His lumbar spine was tender, he had tenderness over the paraspinal muscles, which are muscles of the back and also over the sacroiliac joints, which are between the spine and pelvis, but more on the right side. He had a positive straight leg raise and a stooped gait. Dr. Habashi performed a sciatic nerve stretch test, which was positive at 60 degrees from the table. Dr. Habashi interpreted this test result as showing irritation of the sciatic nerve. He opined that the sciatic nerve can be affected by a lifting injury if one has a bulging disk or some arthritis in the facet joints and that plaintiff's October 10, 2006 MRI of the lumbar spine showed "bulging L5/S1 disk, which is the disk between the 5th lumbar vertebra and the 1st sacral vertebra, and degenerative changes in the facet joints."
14. Based upon plaintiff's history, his examination, his review of the medical records and the diagnostic reports, Dr. Habashi diagnosed plaintiff with a strain of his lumbar spine with injury of the L5-S1 disk, degenerative arthritis in the lumbar spine rendered symptomatic by the injury, right lumbar radiculitis and a cervical sprain.
15. Dr. Habashi opined that plaintiff's injury on August 27, 2006 is the cause of the conditions he diagnosed (strain of the lumbar spine with injury of the L5-S1 disk, degenerative arthritis in the lumbar spine rendered symptomatic by the injury, right lumbar radiculitis and a cervical sprain) and that plaintiff's leg is giving way because he is favoring it, making it become weaker and weaker. His degree of confidence in his opinion was almost 100 percent. He further *Page 7 
opined that leg give-way is very common if a person has sciatic nerve irritation and leg pain, which the plaintiff had.
16. Dr. Habashi agreed with Dr. Knapp's permanent work restrictions for plaintiff; however, he found plaintiff to be at maximum medical improvement on September 27, 2007 and assigned a 10 percent permanent partial impairment rating to the back due to plaintiff's work injury. He also agreed that plaintiff should go to a pain clinic. Dr. Habashi did not find any indication that plaintiff was malingering or exaggerating his condition.
17. Dr. Alfred Rhyne is a board certified orthopaedic surgeon with 99 percent of his practice devoted to spine surgery. Dr. Rhyne saw plaintiff on referral from plaintiff's attorney. Plaintiff had pain in the right leg in the L5 distribution. Dr. Rhyne interpreted a prior MRI as showing some degenerative changes, but no mass effect at the L4 or L5 nerve roots. Plaintiff's prior EMG did not show a pinched nerve. Plaintiff's physical examination revealed mild pain, some tenderness in lower back, some restricted range of motion, but Dr. Rhyne was of the opinion that he was neurologically intact. He diagnosed mechanical back pain and mild degenerative changes in the disc and indicated that no further work-up was warranted.
18. When asked whether he found a correlation between plaintiff's leg pain and back pain, Dr. Rhyne opined that they are probably related. He also acknowledged that plaintiff complained of intermittent loss of control of his right leg and opined that loss of leg control could be related to the back injury at work, that muscle spasm can cause leg give-way, but he did not find the source of plaintiff's complaint and did not think it was related to the spinal injury.
19. Dr. Rhyne did not believe plaintiff was malingering and agreed that, if plaintiff still had difficulty controlling his pain, treatment by a pain clinic would be appropriate. *Page 8 
20. Defendants contend that plaintiff's incapacity to work for defendant-employer is related to his right leg giving way and that this condition is not related to his admittedly compensable back injury. Based upon the greater weight of the evidence, the Full Commission gives greater weight to the medical opinions of Dr. Habashi and finds as fact that plaintiff's right leg giving way is caused by his admittedly compensable injury. Dr. Rhyne opined that plaintiff's right leg giving way could be related to his work injury and that muscle spasms could cause leg give-way. P.A. Katz opined that the most likely cause of plaintiff's right leg give-way was muscle spasms and back pain related to his work injury. The Full Commission further finds as fact that plaintiff's incapacity to return to work for defendant-employer is causally related to his compensable injury.
21. The medical evaluations and treatment provided to plaintiff for his back injury and right leg giving way have been reasonably required to effect a cure, provide relief, and tended to lessen his disability, including the evaluations of Dr. Habashi and Dr. Rhyne. Plaintiff needs future medical treatment, including treatment by a pain management specialist.
22. Plaintiff was still considered an employee of defendant-employer at the time of the hearing before the Deputy Commissioner, but had been advised he must be 100 percent before coming back to work. Due to his leg giving way plaintiff walks with a cane as recommended by P.A. Katz to help prevent him from falling and defendant-employer could not accommodate his restrictions. On his own initiative, plaintiff has made a reasonable, but unsuccessful, job search consisting of seeking work at 30-40 places, plus looking in newspapers.
23. Even though plaintiff has been able to continue his part-time employment as a security guard because his job duties do not require much walking and climbing of steps, which really hurts his back, plaintiff has still proven he is disabled due to his injury. In response to the *Page 9 
question of whether Griffith Security was aware of the problems he has with walking, plaintiff responded, "Yeah, Captain Byrd-he's worked with me real well on that." He further testified that he is put in places where he can handle the job and that the work being provided is all he is able to do. Plaintiff's testimony is found to be credible. There is no evidence establishing that plaintiff has been able to increase his security work hours due to more availability since his injury.
24. Mr. John B. Griffin, chief of security operations for Griffith Security in Hickory, North Carolina, indicated he would consider plaintiff for a suitable position that he can do if it becomes available, but he further testified that there are guardhouse jobs that plaintiff cannot do because the jobs require getting up and moving quickly. He considered plaintiff's speed reaction time to be his biggest restriction. He agreed that plaintiff rode around on golf carts 95 percent of the time and that plaintiff could handle his current security guard job because he could take his time when making his rounds. He further indicated that the part-time weekend jobs tend not to be as demanding as the full-time weekday jobs.
25. On November 9, 2007 plaintiff met with Mr. Lee Anzaldi, the vocational rehabilitation professional assigned by defendants, in the office of plaintiff's attorney. Plaintiff testified that Mr. Anzaldi told him he was doing a good job with his job search, offered a suggestion about trying to find a full-time security guard job and advised that he probably would not be providing assistance to plaintiff with his job search. Plaintiff's testimony concerning his meeting with Mr. Anzaldi is found to be credible.
 ***********
Based upon the foregoing findings of fact, the Full Commission enters the following: *Page 10 
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury to his back on August 27, 2006, arising out of and in the course of his employment as a direct result of a specific traumatic incident of the work assigned to him by defendant-employer. N.C. Gen. Stat. § 97-2(6) (2007).
2. Defendants admitted the compensability of plaintiff's claim and provided employment to plaintiff, within his work restrictions until plaintiff began to experience right leg give-way. Plaintiff's right leg give-way is caused by the compensable August 27, 2006 injury at work. Dr. Maher Habashi opined that Plaintiff's low back condition and leg giving way are more likely than not caused by the August 27, 2006 work injury. The opinion of P.A. Katz is consistent with those of Dr. Habashi. Dr. Rhyne even opined that plaintiff's leg giving way could be related to his work injury and that muscle spasms can cause leg give-way. Dr. Habashi's opinions satisfy the requirements of Holley v.ACTS, Inc., which sets forth the minimum standards required for the admission of medical causation testimony in workers' compensation cases, including the requirement that the testimony be "more likely than not," and Young v. Hickory Business Furniture, which requires that an expert opinion be based on more than mere speculation and conjecture. Holley v.ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750 (2003); Young v. HickoryBusiness Furniture, 353 N.C. 227, 538 S.E.2d 912 (2000). The Full Commission has given greater weight herein to Dr. Habashi's testimony, and has found it to be persuasive. It is well established in North Carolina that the Full Commission can give more weight to the testimony of a particular physician or other health care provider over others.Adams v. Metals USA, 168 N.C. App. 469, 608 S.E.2d 357, affirmed percuriam, 360 N.C. 54, 619 S.E.2d 495 (2005); Adams v. AVX Corp.,349 N.C. 676, 509 S.E.2d 411 (1998). *Page 11 
3. To a reasonable degree of medical certainty, P.A. Katz opined that the most likely cause of Plaintiff's right leg give-way is muscle spasms and low back pain from the August 27, 2006 work injury. In reaching her opinion, P.A. Katz testified that she considered the fact that plaintiff's condition improved by use of certain medications, that tests for other causes were negative, and that spasms can produce sudden weakness or leg give-way. The medical notes of P.A. Katz were signed by Dr. Yapundich, her supervising neurologist. Defendants contend that a physician's assistant is not competent to give expert medical opinion testimony relating to medical causation, interpretation of test results and subjective findings. Although the opinion of P.A. Katz on the cause of plaintiff's right leg give way is consistent with those of Dr. Habashi, the Full Commission has placed more weight on the opinions of Dr. Habashi. However, it is well-settled in North Carolina that non-physician health care providers such as physician's assistants may properly render medical causation opinions, assuming that the opinions otherwise meet the minimum standards required for the admission of medical causation testimony, including the requirement that the testimony be non-speculative and "more likely than not." Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003); Young v. Hickory Business Furniture,353 N.C. 227, 538 S.E.2d 912 (2000); State v. White, 340 N.C. 264,457 S.E.2d 841 (1995), cert. denied, 516 U.S. 994, 133 L.Ed.2d 436
(1995); Maloney v. Wake Hospital Systems, Inc., 45 N.C. App. 172,262 S.E.2d 680, disc. rev. denied, 300 N.C. 375, 267 S.E.2d 676 (1980). Further, the Full Commission has the authority to give more weight to the testimony of a physician's assistant over other health care providers.Adams, 168 N.C. App. 469, 608 S.E.2d 357 (2005), affirmed per curiam,360 N.C. 54, 619 S.E.2d 495 (2005); Adams, 349 N.C. 676, 509 S.E.2d 411
(1998). *Page 12 
4. In order to meet the burden of proving disability, a plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. PerdueFarms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. LowesProduct Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demeryv. Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485, (2001).
5. The plaintiff has carried his burden of proving that he continues to be disabled, and that he is entitled to continuing temporary total disability compensation, as a result of the August 27, 2006 injury at work. Plaintiff has produced persuasive evidence establishing that as a result of his admittedly compensable injury he has permanent work restrictions of no lifting over 25 lbs. and to limit his bending. Dr. Habashi assigned a 10 percent permanent partial disability rating to plaintiff's back, based upon the symptoms that he continued to have, including diminished lumbar lordosis, plus tenderness and pain. Additionally plaintiff has produced *Page 13 
persuasive evidence establishing that he has made reasonable efforts to find suitable employment within his restrictions, but has been unsuccessful. Without professional vocational rehabilitation assistance, plaintiff looked, on his own, for 30-40 jobs and Mr. Lee Anzaldi, the assigned vocational rehabilitation expert, told plaintiff he was doing a good job with his job search. Plaintiff has met his burden of proof for establishing disability under Russell by producing sufficient evidence showing that although he is capable of some work, he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment. N.C. Gen. Stat. § 97-29 (2007); Russell, 108 N.C. App. 762,425 S.E.2d 454 (1993).
6. Defendants have not produced sufficient evidence to prove that suitable jobs are available for plaintiff and that plaintiff is capable of obtaining a suitable job, taking into account both his physical and vocational limitations. Although plaintiff has been able to continue working at his part-time security guard job because his specific job duties allow him to ride around on a golf cart 95 percent of the time and he can work at his own pace, defendants have produced no evidence of a suitable job that plaintiff can get, in or outside of the security guard job market with his physical and vocational restrictions. Demery,143 N.C. App. 259, 545 S.E.2d 485 (2001).
7. Pain clinic treatment for plaintiff is reasonably necessary to effect a cure, provide relief, or lessen his disability and is necessitated by the August 27, 2006 injury at work. N.C. Gen. Stat. § 97-25
(2007).
 ***********
Based on the foregoing findings of fact and conclusions of law the Full Commission enters the following: *Page 14 
 AWARD
1. Subject to the attorney's fee below, defendants shall continue to pay plaintiff temporary total disability compensation at the rate of $240.01 per week until further order of the Industrial Commission.
2. An attorney's fee of 25 percent of the compensation awarded in paragraph 1 above is approved for plaintiff's counsel. Defendants shall deduct the attorney's fee from the accrued and future compensation due plaintiff and pay the same directly to plaintiff's attorney. Plaintiff's counsel shall receive every fourth check from the future compensation due plaintiff.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of his compensable injury/disease, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or may tend to lessen the plaintiff's period of disability, when bills for the same have been approved according to procedures allowed by the Industrial Commission. This shall specifically include continuing medical treatment and also pain clinic treatment to be selected by the employee.
4. Defendants shall pay the costs due to the Industrial Commission.
This the ___ day of February 2009.
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ PAMELA T. YOUNG *Page 15 
CHAIR
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1